UNITED STATES of America, Plaintiff,

v.

Russell R. BARLOW, Defendant.

Crim. A. No. 93–47–P–C.

United States District Court,
D. Maine.

Nov. 18, 1993.

Jonathan A. Toff, Asst. U.S. Atty., Portland, ME, for plaintiff.

Joseph H. Groff, III, Jensen, Baird, Gardner & Henry, Portland, ME, for defendant.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Chief Judge.

On August 24, 1993, a federal grand jury returned an indictment against Defendant, Russell R. Barlow, charging him with attempting to import anabolic steroids, importing anabolic steroids, and attempting to possess anabolic steroids in violation of Title 21 of the United States Code sections 952(b), 960(b)(4), 846, and 844(a). Defendant has filed a motion seeking an order suppressing two oral statements that he made on March 26, 1993, while police executed a search warrant at his home. Defendant's Motion to Suppress Statements (Docket No. 11). An evidentiary hearing was held on November 3, 1993. Based on the evidence presented at that hearing, the Court concludes that the motion should be denied.

### I. FACTS

On the morning of March 26, 1993, at about 10:30 a.m., Special Agent Gerald Baril of the Maine Drug Enforcement Agency, Agent Wilfred Moores, a United States Postal Inspector, and several other agents went to Defendant's home to make a controlled delivery of a package containing anabolic steroids and to execute a search warrant. Finding no one at home to accept the delivery or to secure the Defendant's dog while they executed the search warrant, the agents proceeded to Defendant's place of work. There, Agent Baril advised Defendant that they had a search warrant which they intended to execute at Defendant's house. At that time, Baril told Defendant that he was not under arrest. In addition, Agent Baril told Defendant that he could, but was not required to, accompany the agents to his house. However, if Defendant did not accompany the agents, Baril warned him that they would have to break into the house and tranquilize Defendant's dog. Defendant agreed to accompany the agents.

He was then searched and told that he had to be in the presence of an agent at all times.

Agent Schwartz rode with Defendant in Defendant's car back to the house. Upon arriving at Defendant's house, Defendant admitted the agents to his house. In addition to Agent Baril, five other agents entered the house.

These agents searched the house for approximately one and a half hours. During this time, Defendant sat on a stool in the kitchen area which was separated from the dining area by a counter. Agent Baril sat at the table in the dining area at a distance of less than six feet from Defendant. Agent Baril was situated in such a way that he could watch Defendant throughout the search and that he was in front of the only exit from the kitchen. Agent Baril testified that Defendant was not free to come and go because he might interfere with the search in the house.

Shortly after arriving at the house, Defendant asked permission to call his lawyer. Agent Baril gave him permission to do so. Defendant spoke to his attorney from a phone located in the kitchen. Although Agent Baril was clearly within hearing distance, Defendant did not ask him to leave. During this conversation, Agent Baril asked to speak to Defendant's attorney. Defendant gave Agent Baril the phone, and Baril read the search warrant to the attorney. The attorney told Baril not to question the Defendant and that Defendant would neither help nor hinder the search. Agent Baril stated that he did not read Defendant *Miranda* warnings because Defendant had already spoken to his lawyer.

About ten minutes later, the phone rang and Agent Baril answered it. After ascertaining that it was Defendant's attorney, Baril allowed Defendant to speak to him. Again, Defendant did not ask Baril to leave and Baril did not volunteer to do so. During the course of this brief conversation, Defendant allegedly read the search warrant and said, "I'll give them everything I have here" or words to that effect.

About twenty minutes after this phone conversation, two other agents, Agent Moores and Agent Schwartz, joined Agent Baril at the table less than six feet from Defendant. There, Agent Moores and Agent Schwartz compared a copy of a handwritten order for anabolic steroids that Agent Moores had brought with him with handwritten notes they had found in the house. *See* Government Exhibit 3. Agent Moores testified that he did not hold the documents up or recall giving them to Defendant.[1] Agent Moores stated that this discussion took place at the table near Defendant because that was where Moores had placed his notes, which included the handwritten order, when he arrived at the house. Defendant, apparently overhearing this conversation and observing the agents, said something to the effect that it "kind of looks like my handwriting." Moores testified that he did not intend to elicit a response from the Defendant when he was comparing the order with the notes found in the house.

## II. DISCUSSION

Defendant seeks suppression of the two statements made during the course of the execution of the search warrant, arguing that these statements are the product of custodial interrogation and were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* dictates that statements which are the product of custodial interrogation by a state agent are admissible only if the government demonstrates that a defendant was advised of certain rights and that those rights were voluntarily waived. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. Here, it is undisputed that Defendant was never advised of his Constitutional rights as required by *Miranda.*

The Government, on the other hand, argues that *Miranda* is not implicated in this case because the statements were voluntarily made and were not the product of interrogation. Consolidated Response to Defendant's Motions and Incorporated Memorandum of Law, Docket No. 12, at 8–9. In articulating this argument, the Government neither con-

---

1. Agent Baril testified that he believed that Defendant asked to see the documents and that they were held up in his direction.

cedes nor denies that Defendant was in custody. Because noncustodial interrogation does not violate *Miranda's* mandates, the Court will first consider whether Defendant was in custody and then whether the statements were the product of interrogation.

## A. CUSTODY

■ An interview is "custodial" if a reasonable person in the defendant's position would believe that he was "deprived of his freedom of action in any significant way." *Miranda*, at 444, 86 S.Ct. at 1612. As a general rule, courts are unlikely to find that an interview which takes place in a defendant's home is "custodial" because the familiarity of the surroundings tends to dispel the "police-dominated" atmosphere which characterizes custodial situations. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Nevertheless, detention of a person at home during the execution of a search warrant may amount to custody for purposes of *Miranda*. *See, e.g., United States v. Rowe*, 694 F.Supp. 1420 (N.D.Cal. 1988) (holding that lawful detention of defendant during the execution of a search warrant was "custody" for purposes of *Miranda* because defendant "might reasonably have concluded that she was not free to leave her apartment."); *United States v. Stevens*, 543 F.Supp. 929 (N.D.Ill.1982). The question is "how a reasonable [person] in [Defendant's] position would have understood his position." *United States v. Musgrave*, 726 F.Supp. 1027 (W.D.N.C.1989).

■ On the facts of this case, Defendant was subjected to a significant deprivation of his freedom of action by the Agents' instructions and actions. Specifically, he was told that he had to be in the presence of an agent at all times, he was searched, kept under observation, and his phone was answered by Agent Baril. From Defendant's actions, it appears that he did conclude he was not free to go. He stayed in one place throughout the search, and he asked permission to use his own phone. Finally he was never told that he was free to go, and Agent Baril indicated that he would have been followed had he tried to leave. A reasonable person in Defendant's position would not have un-

derstood that he was free to go. Therefore, the Court concludes that Defendant was in custody.

## B. INTERROGATION

■ *Miranda* makes clear, however, that not every statement made while in custody is barred by the Fifth Amendment.

> "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel *but whether he can be interrogated*." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. (Emphasis added.)

Interrogation includes not only express questioning but also conduct by law enforcement agents which amounts to the "functional equivalent" of questioning. *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Conduct is the functional equivalent of questioning when state agents use words or actions that they should know are "reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1690. The facts in the present case, as established at the evidentiary hearing, indicate that the statements at issue were not the product of direct questioning by law enforcement agents. Therefore, the only issue for the Court to consider is whether the statements were made in response to conduct by the Agents which was the functional equivalent of interrogation.

### 1. STATEMENT MADE BY DEFENDANT TO HIS ATTORNEY

■ The first statement, made during the phone conversation with Defendant's attorney, was not a response to any action or words of the agents. Here, Defendant asked to call his attorney and, although Agent Baril was no more than six feet away, Defendant did not ask him to distance himself from the conversation. Nor is there any reason to believe that, from Defendant's perspective, being permitted to talk to an attorney would make him feel like he was being compelled to

make incriminating statements. *See Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). In *Mauro,* the Supreme Court held that permitting a suspect's wife to speak with him was not the functional equivalent of interrogation. In so holding, the Court observed:

> "We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." *Id.* at 528, 107 S.Ct. at 1936.

The Court also noted that it was the wife, not the police, who initiated the conversation. *Id.* Here, the reasoning of *Mauro* is controlling. It is very doubtful that Defendant, when allowed to speak to his attorney, felt "that he was being coerced to incriminate himself in any way." *Id.* Defendant, himself, asked to speak to his attorney; it was not a ploy initiated by the agents to overhear statements. Finally, denying Defendant's request to speak to his attorney was more likely to increase the coercive atmosphere than granting his request. Therefore, the Court concludes that the statement which Agent Baril overheard was not the product of interrogation.

### *2. STATEMENT REGARDING THE HANDWRITING*

■ Defendant's second statement was made in response to words and actions of three agents, who stood comparing his handwritten notes found in the house with a copy of a letter that they had brought with them to the house. The Court must, therefore, determine whether the officers should have known that their conduct was reasonably likely to elicit a response from the Defendant. *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90. The primary focus of this inquiry is not on the intent of the officers, but on the perceptions of the suspect. *Id.*[2] This focus reflects the basic constitutional concern addressed in *Miranda:* the Fifth Amendment protection against *compulsory* self-incrimination. *Mauro,* 481 U.S. at 526–27, 107 S.Ct. at 1935. The issue is not whether the police

believed that certain actions might elicit a statement from a suspect, but whether a suspect would perceive of such actions as requiring or requesting a response. *Id.*

■ It has been generally held that merely discussing evidence against a defendant or the course of the investigation in front of a defendant is not interrogation. *See, United States v. Hine–Pino,* 966 F.2d 1440 (1st Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992) (holding that conversation between two officers on input of case information into computer was not a subtle form of interrogation); *Shedelbower v. Estelle,* 885 F.2d 570 (9th Cir.1989), *cert. denied,* 498 U.S. 1092, 111 S.Ct. 975, 112 L.Ed.2d 1060 (1991) (telling defendant that he had been identified by victim was not interrogation); *Ray v. Duckworth,* 881 F.2d 512, 518 (7th Cir.1989) ("merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct"); *United States v. Payne,* 954 F.2d 199 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992) (telling defendant that a gun was found in his home was not interrogation); *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). *Innis,* itself, raised the issue of whether discussion of the investigation of the crime of which a defendant is accused in his presence constitutes interrogation. There, the police officers made offhand remarks in the presence of the defendant about the danger that the sawed-off shotgun, which the defendant had abandoned near a school for handicapped children, might be found by a handicapped child. In holding that the conversation was not the functional equivalent of interrogation, the *Innis* Court noted that it was a dialogue to which no response from the suspect was invited and that the officers had no way of knowing that Innis was particularly susceptible to this type of appeal to his conscience. *Innis,* 446 U.S. at 302, 100 S.Ct. at 1690. The facts of the present case clearly do not amount to the functional equivalent of interrogation in light of *Innis.*

---

**2.** Nevertheless, the officers' intent is not irrelevant because it bears on whether they "should have known" that particular conduct was likely to evoke an incriminating response. *Innis,* at

301, 100 S.Ct. at 1690. In this case, Moores testified that he had not intended to elicit a response from Defendant. The Court credits this testimony.

 First, as in *Innis*, there is nothing in the record to suggest that the Agents' conduct required or invited a statement from Defendant. Their discussion was not directed towards Defendant. Rather, Agent Moores and Agent Schwartz stood with their backs turned, comparing writing samples, at a distance of four to six feet from Defendant. The discussion took place at this particular spot because Agent Moores had left his notes on the table when they entered the house. Moores testified that he did not hold up the documents that they were comparing.[3] If the Agents had directly informed Defendant of the evidence they believed they had against him, this in itself would not have been interrogation. *Shedelbower v. Estelle*, 885 F.2d 570 (9th Cir.1989), *cert. denied*, 498 U.S. 1092, 111 S.Ct. 975, 112 L.Ed.2d 1060 (1991); *Ray v. Duckworth*, 881 F.2d 512 (7th Cir.1989); *United States v. Payne*, 954 F.2d 199 (4th Cir.1992). Here, as in *Innis*, Defendant was not included in the conversation, and the Court finds nothing in the conduct of the agent which appears to have invited Defendant's input.

Nor did the discussion constitute an appeal to Defendant's conscience or a psychological ploy designed to overcome Defendant's will. As the Supreme Court observed in *Innis*, " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689. Here no additional element of compulsion is present. There were no veiled promises or threats and no appeal to Defendant's conscience. Under these circumstances, the Court finds that the Defendant's statement regarding the handwriting was voluntary.

Accordingly, it is hereby *ORDERED* that Defendant's Motion to Suppress be, and it is hereby, *DENIED*.

---

**3.** Agent Baril's recollection that Defendant asked to see the documents, which were then held up in his direction, does not suggest a contrary result. As the Court of Appeals for the First Circuit recently held, *Miranda* does not require law enforcement agents to refuse to respond to direct questions from suspects. *United States v. Taylor*, 985 F.2d 3 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2426, 124 L.Ed.2d 647 (1993). The issue remains whether, the conduct of the agents prior to that moment was reasonably likely to elicit statements from Defendant.