**UNITED STATES of America**

v.

**David J. BRUNETTE, Defendant.**

**Criminal No. 99–40–P–C.**

United States District Court,
D. Maine.

Nov. 8, 1999.

Richard W. Murphy, Asst. U.S. Atty., Office of U.S. Atty., Portland, ME, for U.S.

Jeffrey W. Langholtz, Biddeford, ME, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

On May 28, 1999, a federal grand jury returned an Indictment against Defendant David J. Brunette charging him with one count of transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) (Count I), and three counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (Counts II, III, and IV). Indictment (Docket No. 1). The grand jury also charged Defendant with the use of certain personal property in the commission of the aforementioned offenses, thereby subjecting that personal property to forfeiture pursuant to 18 U.S.C. § 2253 (Count V). *Id.* Now before the Court are Defendant's Motion to Suppress Search Warrant Evidence (Docket No. 7), and Defendant's Motion to Suppress Statements (Docket No. 8). On September 28, 1999, the Court held an evidentiary hearing in this matter. Based on the evidence presented at that hearing, the Court concludes that Defendant's Motion to Suppress Statements will be denied, and that Defendant's Motion to Suppress Search Warrant Evidence will be denied in part and granted in part.

## FACTS

The initial facts set forth below are derived from evidence produced at the September 28th hearing. In early January of 1999, James Tobias of the Concentric Network Corporation ("CNC")[1] contacted Special Agent Joseph Lazarro of the United States Customs Service ("Customs Service") in Michigan. Hearing Transcript, Exhibit 1, Affidavit at 5 ¶ 1. Tobias reported to Lazarro that on January 1, 1999, Defendant David J. Brunette, a CNC subscriber, had posted seventy-nine images of a nude prepubescent boy, or boys, onto an Internet news-group site. *Id.* Because Defendant was a resident of Eliot, Maine, Lazarro relayed this information to Customs Service Special Agent Richard Jereski in Portland, Maine. *Id.* Lazarro also informed Jereski that Tobias had downloaded onto a diskette thirty-four of the seventy-nine images that Defendant had posted on the Internet site, and that the diskette was being forwarded to him for his review. *Id.* After viewing the images on the diskette, Jereski applied for a warrant to search Defendant's home for items related to child pornography. Hearing Transcript, Exhibit 1. On February 4, 1999, a search warrant for Defendant's premises was issued. *Id.* at 11.

The testimony given at the September 28th hearing produced the following facts. On the morning of February 9, 1999, Jereski, Customs Service Special Agents Stephen Marx and Brian Featheringham, and three uniformed Eliot police officers went to Defendant's home to execute the search warrant. At about 7:30 a.m., one of the agents knocked on Defendant's door, and Defendant answered the door wearing a bathrobe. Marx asked Defendant to identify himself, which he did, and Marx then asked Defendant to step outside. Marx explained to Defendant that he and the other agents were there to execute a federal search warrant and that Defendant was not under arrest. Marx also told Defendant that he was free to leave at any time but that, if he chose to stay, he could not interfere with the agents' search of the premises.

As Marx was instructing Defendant, Jereski and Featheringham entered Defendant's home, with their weapons drawn, in order to conduct a protective "sweep" of the premises. The sweep lasted approximately two or three minutes. The sweep revealed no other persons in the home. Consequently, the agents holstered their weapons and declared the home "clear." Defendant was then permitted back inside

1. CNC is an Internet service provider that permits its subscribers access to the Internet.

his residence, which Marx described at the hearing as a type of mobile home. Also at about this time, Jereski exited Defendant's home to remove his flak jacket, which he had worn during the protective sweep of Defendant's home.

Once back inside the residence, Marx and Defendant proceeded to the living room area. Marx again explained to Defendant that he was not under arrest and that he was free to leave at any time. Marx also told Defendant that if he chose to stay, he could not interfere with the agents' search. Marx then explained to Defendant the nature of the agents' investigation and that he wished to ask Defendant some questions. Defendant made no objections to Marx's instructions, and he remained on the premises. Defendant also indicated his willingness to answer Marx's questions.

Throughout the foregoing conversation and subsequent interview, Defendant was seated on his couch. Marx was also seated on the couch, in close proximity to Defendant because of the limited size of the living room area. Within the view of Defendant during this entire time was a uniformed Eliot police officer. The officer was stationed at Defendant's front door, which opened immediately into Defendant's living room. The officer was stationed in this manner for the purpose of ensuring the safety of the officers and agents. The officer, however, never asked Defendant any questions.

Shortly after Marx and Defendant had reentered the premises, Jereski joined them in the living room area. Marx told Jereski, in the presence of Defendant, that he had informed Defendant that he was not under arrest and that he could leave at any time. Marx also informed Jereski that he had explained to Defendant that the only restriction on his conduct was that he could not interfere with the agent's search. Defendant at this time indicated that he wished to put some pants on since he was dressed only in his bathrobe. Marx acceded to Defendant's request, and

Jereski accompanied Defendant to his bedroom while he dressed. Jereski testified that he accompanied Defendant to the bedroom in order to ensure the safety of the agents and officers, and also to make sure that no evidence was destroyed or hidden.

After Defendant dressed, he and Jereski returned to the living room area. At that time, Marx began to question Defendant. Defendant never declined to answer any of Marx's inquiries, nor did Defendant ever request an attorney. Defendant, however, did request permission to smoke, to which Marx responded that it was Defendant's home and, of course, he could smoke. At no time was Defendant given his *Miranda* warnings.

Marx questioned Defendant for approximately forty-five minutes, and Jereski questioned Defendant for about fifteen minutes. At the hearing, Marx testified that the tenor of the discussion was cordial, businesslike, and matter-of-fact. Jereski described the interview as professional. Marx testified that no one ever raised his voice to Defendant, and that he was never moved about the residence or physically touched by any of the agents or officers except incidentally. The evidence also indicated that Defendant was never handcuffed or restrained in anyway.

At the conclusion of the interview, Jereski and Marx, pursuant to the search warrant, examined computer equipment and other documents in Defendant's home. Additionally, either Marx or Defendant called Defendant's employer to inform him that Defendant would be late for work that day. Marx also spoke to Defendant's employer and inquired in general terms about Defendant's work computer and his access to other computers.

Finally, throughout the entire period of time that the officers and agents were in Defendant's home, a uniformed Eliot police officer moved continuously about the residence searching for items listed in the search warrant. Before leaving Defendant's home, the agents and officers seized

Defendant's computers and other items. The entire search of Defendant's residence took approximately two hours, as the agents and officers left Defendant's premises at about 9:30 a.m.

### DISCUSSION

#### I. *Defendant's Motion to Suppress Statements*

Defendant has moved to suppress the statements that he made to Marx and Jereski during the Government's execution of the search warrant at his home. Defendant argues that the statements he made to the agents were the product of custodial interrogation and, therefore, were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Memorandum in Support of Defendant's Motion to Suppress Search Warrant Evidence at 3 (Docket No. 14). *Miranda* "dictates that statements which are the product of custodial interrogation by a state agent are admissible only if the government demonstrates that a defendant was advised of certain rights and that those rights were voluntarily waived." *United States v. Barlow*, 839 F.Supp. 63, 65 (D.Me.1993). Here, it is undisputed that Defendant was not given any *Miranda* warnings. Therefore, if the interrogation of Defendant was custodial, the statements Defendant made to the agents must be suppressed.

The Government concedes, for purposes of argument here, that Defendant was not given any *Miranda* warnings and that Defendant was interrogated. Government's Objection to Defendant's Motion to Suppress Search Warrant Evidence at 5–6 (Docket No. 17). Nonetheless, the Government argues that Defendant was never "in custody" and, therefore, because noncustodial interrogations do not violate *Miranda's* mandates, Defendant's statements to Marx and Jereski must not be suppressed.

■ "An interview is 'custodial' if a reasonable person in the defendant's position

would believe that he or she was deprived of freedom of action in any significant way." *United States v. Bullins*, 880 F.Supp. 76, 78 (D.N.H.1995). "As a general rule, courts are unlikely to find that an interview which takes place in a defendant's home is 'custodial' because the familiarity of the surroundings tends to dispel the 'police-dominated' atmosphere which characterizes custodial situations." *Barlow*, 839 F.Supp. at 66. "Nevertheless, detention of a person at home during the execution of a search warrant may amount to custody for purposes of *Miranda*." *Id.*

■ "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Barlow*, 839 F.Supp. at 66 (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). In order to determine whether there was a "manifestation of a significant deprivation of or restraint on the suspect's freedom of movement," the court should take into account such factors as "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Lanni*, 951 F.2d 440, 442 (1st Cir.1991) (citations omitted).

■ On the facts of this case, the Court finds that Defendant was not subjected to a significant deprivation of his freedom of action by the agents' instructions or conduct. The evidence produced at the hearing demonstrates that Defendant was informed, on at least three occasions, that he was not under arrest, and that he was free to leave at any time. In addition, there is nothing in the evidence to indicate that any of the agents or officers engaged in

any nonverbal conduct that would have undermined their verbal assurances to Defendant. Defendant was never told that he had to remain in any one area of his home, and he was not moved about his home involuntarily. Defendant was permitted to smoke, and to use his telephone to call his employer to inform him that he would be late for work. Defendant, upon his request, was also permitted to move to his bedroom to change his clothing since he was dressed initially only in a bathrobe. Even though Jereski accompanied Defendant to his bedroom while Defendant changed, that fact alone does not alter the noncustodial nature of the encounter. Jereski testified that he accompanied Defendant to his bedroom to ensure the safety of the other officers and agents, as well as to safeguard any evidence located within the home; two plainly legitimate reasons for accompanying Defendant.

Moreover, Defendant was outside of his home for only a very short period of time while the initial sweep of the premises was conducted. Following the sweep, Defendant was returned immediately to the familiarity of his own home. Furthermore, Marx informed Defendant of the agents' business there, and Marx asked Defendant if he could ask him some questions. There is no evidence to contradict Marx's assertion that Defendant freely responded that he would answer the agents' questions. Additionally, no agent or officer ever badgered Defendant or raised their voice to him. The entire interview of Defendant was completed in about an hour. Finally, although uniformed officers where in Defendant's sight, and moving throughout the home during the entire interview, there is no evidence to suggest that there was a "police-dominated atmosphere" inside Defendant's home.

The Court is convinced that a reasonable person in Defendant's position would have believed that he was free to leave the premises at any time and that his freedom of action was not deprived in any significant way. Accordingly, no "custodial" interrogation of Defendant occurred in the present case, and Defendant's Motion to Suppress Statements will be denied.

II. *Motion to Suppress Search Warrant Evidence*

Although at the September 28th hearing, the Court intended to hear testimony only as to the facial validity of Jereski's warrant affidavit, other issues regarding the sufficiency of the warrant affidavit arose as well. In particular, the veracity of certain factual statements contained in Jereski's warrant affidavit were called into question. As a result, the Court is faced with two separate issues: first, whether an assertion in a warrant affidavit that an image depicts a "prepubescent boy lasciviously displaying his genitals" is sufficient, as a matter of law, to support a magistrate judge's determination that probable cause exists to search for items related to child pornography; second, whether Jereski's warrant affidavit contains materially false statements that were necessary to the magistrate judge's finding of probable cause in this case. The Court will consider each issue in turn.

A. Facial Validity of the Warrant Affidavit

Defendant argues that the "unsubstantiated legal conclusion" in Jereski's warrant affidavit that the diskette images he viewed were of a "prepubescent boy lasciviously displaying his genitals," is insufficient, as a matter of law, to support the magistrate judge's finding that probable cause existed in this case. Memorandum in Support of Defendant's Motion to Suppress Search Warrant Evidence at 3 (Docket No. 13). Thus, Defendant argues, the evidence obtained through the execution of the Government's search warrant must be suppressed.

The Government argues in opposition to Defendant's motion that, as a result of Jereski's training and experience in child pornography investigations, he was able to apply the statutory provisions relating to prohibited child pornographic materials.

Government's Objection to Defendant's Motion to Suppress Search Warrant Evidence at 7 (Docket No. 18). Therefore, the Government maintains that the magistrate judge reasonably relied upon Jereski's description of the images in reaching a probable cause determination, and the motion to suppress must be denied. *Id.*

In this circuit, the issue of whether a magistrate judge may rely solely upon an affiant's assertion in a warrant affidavit that a defendant possessed materials depicting a "prepubescent boy lasciviously displaying his genitals," for purposes of establishing probable cause to search for child pornography, has not been decided. Courts in other jurisdictions that have addressed similar issues have reached mixed results. *Compare United States v. Harned,* 182 F.3d 928, 1999 WL 362397, *4 (9th Cir.1999) (assertion that photograph depicts "[juveniles] engaged in explicit sexual acts with adults" is, by itself, insufficient basis for probable cause), *with United ed States v. Smith,* 795 F.2d 841, 848–49 (9th Cir.1986) (assertion that photograph depicts "sexually explicit conduct" sufficient for finding of probable cause), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987); *see also United States v. Jasorka,* 153 F.3d 58, 60 (2d Cir.1998) (court declined .to address sufficiency of warrant affidavit statement and held that officer's "good faith" reliance on warrant reasonable under *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984)). Because there is no authority in this circuit with regard to the issue presented here, the Court, as appropriate, will look to other federal courts for guidance.

■ At the outset, however, it is useful to review the law regarding search warrants and probable cause. Probable cause is simply, whether, under the totality of the circumstances there exists a "fair probability" that a search of a particular place will uncover evidence of a crime. *United States v. Jewell,* 60 F.3d 20, 23 (1st Cir.1995). As to the issuance of search warrants, the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), stated that

> [t]he task of the [warrant] issuing magistrate judge is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

With these principles in mind, the Court turns to the facial sufficiency of Jereski's warrant affidavit.

Jereski's warrant affidavit provides that he had been employed by the Customs Service in the Portland Office of Investigations for over one year. Hearing Transcript, Exhibit 1, Affidavit at 1 (Docket No. 21). While there, Jereski was trained in the area of child pornography investigations and, in fact, at that time, he was conducting a number of such investigations. *Id.* In particular, Jereski was investigating Defendant for possible violations of 18 U.S.C. §§ 2252 and 2252A, the child pornography statutes. *Id.*

With regard to his investigation of Defendant, Jereski's warrant affidavit provides that on January 11, 1999, Jereski received a telephone call from Lazarro, the Customs Service agent located in Michigan. Hearing Transcript, Exhibit 1, Affidavit at 5 ¶ 1. Lazarro told Jereski that Tobias of CNC had informed him that Defendant had posted seventy-nine images of a nude prepubescent boy engaged in a lascivious display of his genitalia on the Internet. *Id.* Lazarro also told Jereski that Tobias had downloaded some thirty-four of the seventy-nine images onto a diskette and that the diskette was being forwarded to Jereski for his review. *Id.* at 7 ¶ 4.

On January 12, 1999, Jereski telephoned Tobias concerning Tobias' own investigation of Defendant for CNC. *Id.* at 6 ¶ 3. In

their conversation, Tobias explained to Jereski that he was an investigator, for CNC, of improper postings on the Internet. *Id.* Tobias also explained to Jereski that he had, through the use of various investigation techniques, linked the images at issue in this case to Defendant. *Id.* Of particular importance here, Jereski stated in his warrant affidavit with respect to these images: "I have viewed [the] images, and all appear to be photographs of a prepubescent boy lasciviously displaying his genitals." *Id.* Based upon the foregoing, Jereski concluded that he had probable cause to search Defendant's home for materials, evidence, and documents related to child pornography. *Id.* at 10 ¶ 14. The magistrate judge agreed, and issued the search warrant for Defendant's premises on February 4, 1999. *Id.* at 11.

In the present case, it appears that Jereski's assertion in his warrant affidavit that the images depicted "a prepubescent boy lasciviously displaying his genitals," was an attempt on his part to mirror the language of 18 U.S.C. § 2256(2)(E) (" § 2256"), in which "sexually explicit conduct," for purposes of child pornography, is defined as the "lascivious exhibition of the genitals." Section 2256 provides in relevant part:

Definitions for chapter. For the purposes of this chapter, the term—

(1) "minor" means any person under the age of eighteen years;

(2) "sexually explicit conduct" means actual or simulated—

(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(B) bestiality;

(C) masturbation;

(D) sadistic or masochistic abuse; or

(E) lascivious exhibition of the genitals or pubic area of any person....

Defendant, however, challenges the appropriateness of the magistrate judge's reliance on Jereski's plain assertion, mirrored upon the statutory language regarding child pornography, that the diskette images were of a "prepubescent boy lasciviously displaying his genitals." Defendant claims that this assertion constitutes an insufficient basis upon which the magistrate judge could determine that probable cause existed to search Defendant's home for child pornography. For the following reasons, the Court disagrees.

In *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), the Supreme Court drew a significant distinction between obscenity and material criminalized because it involved the sexual exploitation of children. The Supreme Court found that because of the state's interest in protecting children from sexual exploitation, child pornography could be banned regardless of whether it failed to meet the test for obscenity as set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See Ferber,* 458 U.S. at 764, 102 S.Ct. at 3348; *Jasorka,* 153 F.3d at 60. It is this finding by the Supreme Court in *Ferber* that is particularly instructive here.

■ In the present case, Defendant's argument that the magistrate judge could not rely on Jereski's assertion that the diskette images depicted "a prepubescent boy lasciviously displaying his genitals" is essentially an argument that Jereski was incapable of *evaluating* those images in order to determine whether they constituted child pornography. Under the reasoning of *Ferber,* however, Jereski was not required to *evaluate* the content of images in order to determine whether they depicted a "minor" engaged in "sexually explicit conduct." *See* 18 U.S.C. §§ 2256(1) and (2) (" § 2256"); *see also Smith,* 795 F.2d at 847 n. 7. Rather, Jereski was required only to *observe* whether the images fit into one of the "suitably limited and described" categories of "sexually explicit conduct" as listed in § 2256(2)(A)-(E). *See Ferber,* 458 U.S. at 764, 102 S.Ct. at 3358; *Smith,* 795 F.2d at 841 n. 7.

In other words, because Jereski was identifying what appeared to be child pornography, not obscenity, he was not required to set forth factually his knowledge of the prurient interests of the average person or, for example, be able to ascertain what portrayals of sexually explicit conduct would be considered patently offensive. *See Miller,* 413 U.S. at 24, 93 S.Ct. at 2615. Instead, Jereski was required only to determine whether the diskette images fell within one of the limited categories of "sexually explicit conduct" as listed in § 2256, *Ferber,* 458 U.S. at 764, 102 S.Ct. at 3358; and while such an "identification is certainly 'conclusory' to a certain extent, ... it is a conclusion based on observation and not, as in the case of 'obscenity,' one based on evaluation." *Smith,* 795 F.2d at 847 n. 7.

Thus, for the search warrant to be valid in this case, the Court must make two findings. First, the Court must determine whether, for purposes of child pornography, the phrase "lascivious display of the genitals" is a "limited and described" category of "sexually explicit conduct"; and, if so, second, whether, based upon the facts asserted in Jereski's warrant affidavit, a sufficient basis exists to support the conclusion that Jereski was able to identify whether the diskette images fell within that category of "sexually explicit conduct."

As to the first inquiry, Congress has provided that, with respect to child pornography, the term "lascivious exhibition of the genitals or pubic area of any person" is a defined category of "sexually explicit conduct." Title 18 U.S.C. § 2256(2) provides in relevant part:

For the purposes of this chapter, the term—

(1) "minor" means any person under the age of eighteen years;

(2) "sexually explicit conduct" means actual or simulated—

. . .

(E) lascivious exhibition of the genitals or pubic area of any person....

*See also United States v. Horn,* 187 F.3d 781, 789 (8th Cir.1999) (in child pornography context, images that contain "sexually explicit conduct" include images depicting "lascivious display of the genitals or pubic area of any person"). Therefore, for purposes of child pornography, the term "lascivious exhibition of the genitals" is a limited and defined category of "sexually explicit conduct." 18 U.S.C. § 2256(2)(E).[2] With this issue settled, the Court turns its attention to whether Jereski, based upon the facts asserted in the warrant affidavit, was able to identify whether the images depicted a minor "lasciviously displaying his genitals."

As indicated above, the warrant affidavit indicates that Jereski was trained by the Customs Service to conduct child pornography investigations. Hearing Transcript, Exhibit 1, Affidavit at 1. The warrant affidavit also indicates that in addition to his child pornography investigation of Defendant, Jereski was also in the process of conducting other investigations of this type. *Id.* The warrant affidavit also sets forth the factual basis surrounding the origin of Jereski's investigation of Defendant. Specifically, the affidavit provides that in a telephone conversation with Tobias of CNC, Tobias informed Jereski that in early January of 1999, an "Internet watchdog group" had contacted CNC to complain that "someone using a CNC Internet provider address had posted nude images of a minor" on the Internet. Hearing Transcript, Exhibit 1, Affidavit at 6 ¶ 3. Tobias

---

**2.** The fact that Jereski stated in his warrant affidavit that the images were of a prepubescent boy "lasciviously *displaying* his genitals," as opposed to "lasciviously *exhibiting* his genitals," is of no consequence. Hearing Transcript, Exhibit 1, Affidavit at 7 ¶ 4 (emphasis added). The words "displaying" and "exhibiting" are synonymous; thus, although Jereski's warrant affidavit arguably lacks precision, it sufficiently identifies a category of "sexually explicit conduct."

also told Jereski that he had investigated the complaint and, had determined that Defendant was the individual who had posted the images. *Id.*

■ Based upon these facts, the Court concludes that Jereski was able to identify the diskette images as depicting a "minor" engaged in a "lascivious exhibition of the genitals," as defined in § 2256(2)(E). In the First Circuit, the term "prepubescent children" is sufficiently specific for Fourth Amendment purposes. *See United States v. Diamond*, 820 F.2d 10, 11–12 (1st Cir. 1987). Thus, Jereski's identification of the individual in the images as being of a "prepubescent boy" was sufficient to inform the magistrate judge that the diskette images were of a "minor" as defined in § 2256(1).

Additionally, there were sufficient facts in the warrant affidavit to support Jereski's conclusion that images were of a "lascivious display." The facts of the warrant affidavit indicate that Jereski was trained in child pornography investigations, and that he had conducted a number of investigations of this type before. Therefore, because the facts indicate that Jereski was familiar with child pornography investigations, it is reasonable to draw the logical inference that Jereski was also familiar with the identification of child pornographic materials. *See Smith*, 795 F.2d at 841 n. 7 (experience-based factual conclusions sufficient to support affidavit's assertions).

Moreover, "while the words 'lascivious exhibition of the genitals or pubic area' are perhaps less explicit than the other definitions" of child pornography as listed in § 2256(2)(A)-(E), " 'lascivious' is no different in its meaning than 'lewd,' a commonsensical term whose constitutionality was specifically upheld in *Miller* ...." *United States v. Koelling*, 992 F.2d 817, 821 (8th Cir.1993).[3] Therefore, in the present case, Jereski was not required to have any overly technical or legalistic understanding of

the word "lascivious" in order for him to identify an image that was lewd or otherwise sexually suggestive.

■ Consequently, when the facts of the affidavit are viewed together with the recognition that the term lascivious is to be given a "commonsensical" meaning, the Court finds that Jereski was able to identify that the diskette images depicted "sexually explicit conduct" as defined in § 2256(2)(E). While it may be true that the identification of an image which depicts a "lascivious exhibition of the genitals" may be more problematic than, for example, the identification of an image which depicts bestiality (§ 2256(2)(B)) or masturbation (§ 2256(2)(C)), that fact has no bearing on the Court's decision here. Congress has specifically provided that the term "lascivious exhibition of the genitals" is a category of "sexually explicit conduct," for purposes of child pornography under § 2256(2)(E). Moreover, the Supreme Court has expressly noted that the term "lascivious exhibition," as used in § 2265(2)(E) is not unconstitutionally vague or overbroad. *See United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Supreme Court rejected claim that word "lascivious" was overbroad or vague for purposes of § 2256 and expressly adopted circuit court's finding that use of term constitutional); *see also United States v. Wiegand*, 812 F.2d 1239, 1243–44 (9th Cir.), *cert. denied*, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987). Therefore, this Court has no legal basis to treat § 2256(2)(E) any differently from any of the other categories of "sexually explicit conduct" listed in § 2256(2) simply because lasciviousness may be difficult to identify. Indeed, the identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer. Nonetheless, § 2256(2)(E) is

---

**3.** The Court notes that lascivious is defined as "[t]ending to excite lust; lewd; indecent; obscene; sexual impurity; tending to deprave the morals in respect to sexual relations; licentious." Black's Law Dictionary 882 (6th ed.1990).

entitled to the same force as any of the other categories of "sexually explicit conduct" as listed in § 2256(2) and, for that reason and the other reasons stated above, Jereski's warrant affidavit in this case is facially valid.[4]

### B. Material Misstatement of Fact

In addition to his argument regarding the facial validity of the warrant affidavit, Defendant argues that the warrant affidavit contains material misstatements of fact and, therefore, under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the evidence obtained through the execution of the search warrant must be suppressed. Defendant's Post–Hearing Suppression Brief at 3–4 (Docket No. 24). Specifically, Defendant argues that Jereski's statement in his warrant affidavit, that "all" of the images he reviewed were of a "prepubescent boy lasciviously displaying his genitals," was false and materially misleading. *Id.* Defendant also maintains that Jereski made the foregoing statement either recklessly or intentionally. *Id.* Therefore, Defendant argues, the Court must suppress the evidence seized at Defendant's home.

■■ "Generally speaking, the representations contained in a search warrant affidavit are presumed valid and truthful." *United States v. Scalia,* 993 F.2d 984, 986 (1st Cir.1993). In *Franks,* however, "the Supreme Court held that a defendant was entitled to a hearing at which he could challenge the truthfulness of statements made in an affidavit supporting a search warrant if—and only if—the defendant

made a substantial preliminary showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth, and (2) the falsehood was necessary to the finding of probable cause." *United States v. Hadfield,* 918 F.2d 987, 992 (1st Cir. 1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991).

In the present case, the requirement that Defendant make a "substantial preliminary showing" of the existence of a reckless falsehood in Jereski's warrant affidavit is unnecessary. The Court has already held an evidentiary hearing concerning the warrant affidavit in this matter; as a result, the September 28th hearing was, in essence, a *de facto Franks* hearing. As such, the Court will turn immediately to the sufficiency of the warrant affidavit itself.

At the September 28th hearing, defense counsel closely questioned Jereski concerning his statement in the warrant affidavit that the diskette images "all [appeared] to be photographs of a prepubescent boy lasciviously displaying his genitals." Hearing Transcript, Exhibit 1, Affidavit at 7 ¶ 4; Hearing Transcript at 17–20. Defense counsel's inquiries elicited testimony from Jereski that according to his definition of "lasciviousness," not "all" of the diskette images that he had reviewed were lascivious. Hearing Transcript p. 23–25.

The Court concludes that based upon the testimony given at the September 28th hearing, it is evident that Jereski's asser-

---

4. The Court notes that although the warrant affidavit in this case is facially valid, a factual description of the images contained on the diskette would have been desirable. The Court can conceive of no good reason for providing a reviewing magistrate judge a conclusory statement that an image is prohibited by law, when a factual description of that image could easily have been provided instead.

Moreover, although the Supreme Court in *New York v. P.J. Video, Inc.,* 475 U.S. 868, 874 n. 5, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986),

stated that a magistrate judge is not required to view obscene materials prior to issuing a search warrant for its seizure, that does not mean if an agent is in possession of such materials, they should not be provided to the magistrate judge. Here, the images were available for the magistrate judge's review; and had Jereski and the Government attached those images to the warrant affidavit, most likely, limited judicial time and resources would not have been expended addressing the present issue.

tion in his warrant affidavit that "all" of the photographs were lascivious in nature is not entirely accurate. Particularly, when Jereski was pressed by defense counsel on the issue of whether "all" the photographs were lascivious, Jereski stated: "I can't say all because I don't remember, but *the majority* of the pictures would have been [lascivious] . . . ." Hearing Transcript at 19 (emphasis added). The "majority" of the photographs, however, is not "all" of the photographs. Furthermore, Jereski's later attempt to salvage his position through the assertion that the images were all lascivious in nature when they were viewed together in context is unavailing. *Id.* at 23. Jereski could have indicated as such in his warrant affidavit to the magistrate judge, but for whatever reason, he did not. Thus, the Court finds that Defendant has met his burden that the warrant affidavit contains a false statement of fact.

 Nonetheless, suppression remains an appropriate remedy only if Defendant can make a substantial showing that the false statement in the search warrant affidavit was made intentionally or with reckless disregard of the truth. *United States v. Higgins*, 995 F.2d 1, 3 n. 2 (1st Cir. 1993). "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence . . . the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676.

 Jereski testified at the hearing that he "certainly did not intend to deceive the magistrate judge" with his assertion that "all" of the images were lascivious in nature. Hearing Transcript at 24. Jereski also stated that to "the best of his recollection," the assertion in the warrant affidavit that the images were "all" lascivious in nature was "an overly broad statement" based upon his personal definition of lasciviousness. *Id.* at 32. Indeed, it is

apparent from the totality of Jereski's testimony that he sincerely believed that "all" of the diskette images, when viewed together as a whole, depicted lasciviousness. This is true despite the fact that Jereski admitted on cross-examination that a few of the images, when viewed individually, were not lascivious. Indeed, the record reflects that probably only two or three of the thirty-four images, when viewed individually, were not lascivious in nature. Hearing Transcript at 30.

Presently, therefore, there is no evidence in the record that Jereski's factual inaccuracy in his warrant affidavit was caused by anything more than inadvertence and inattention to detail; two insufficient grounds for invalidating a search warrant. *See Franks*, 438 U.S. at 171, 98 S.Ct. at 2684 (negligence or innocent mistake are insufficient to warrant hearing). Defendant produced no evidence at the hearing to contradict Jereski's testimony that he did not intend to mislead the magistrate judge through his assertion in the warrant affidavit that "all" of the diskette images were lascivious. Additionally, in light of the very few images that Jereski would not have classified as lascivious, when compared with the large majority of images that he did identify as lascivious in nature, there is no evidence that Jereski acted recklessly with regard to the truth of the facts asserted in the warrant affidavit. Consequently, there is no evidence in the record to support the conclusion that Jereski at the time he submitted his warrant affidavit to the magistrate judge for review, subjectively considered the possibility that the magistrate judge would be misled by his overly broad statement regarding the images. Jereski's statement, therefore, although negligent and inadvertent, was not reckless.

Accordingly, the Court finds that Defendant has failed to establish by a preponderance of the evidence that Jereski either intentionally, or with reckless disregard of the truth, made factually inaccurate statements in his warrant affidavit. Therefore,

suppression of the evidence derived through the execution of the search warrant is unwarranted.

## C. Untimely Search of Evidence

Defendant has moved to suppress any evidence obtained from a particular computer that the Government seized from his home on February 9, 1999. Defendant argues that the magistrate judge, in issuing the search warrant, specifically provided that all evidence gathered from Defendant's computers was to be reviewed by April 8, 1999. Defendant's Post–Hearing Suppression Brief at 4–5. Here, the Government concedes that the search of Defendant's Leading Edge computer was not commenced until April 10, 1999. *See* Government's Objection to Defendant's Motion to Suppress Search Warrant Evidence at 4. Therefore, Defendant argues, any evidence gathered from that computer must be suppressed as a result of the Government's failure to adhere to the requirements of the magistrate judge's order.

█ It is settled law that the search and seizure of evidence, conducted under a warrant, must conform to the requirements of that warrant. *Massachusetts v. Sheppard*, 468 U.S. 981, 988, 104 S.Ct. 3424, 3428 n. 5, 82 L.Ed.2d 737 (1984); *United States v. Upham*, 168 F.3d 532, 536 (1st Cir.1999), *cert. denied*, —— U.S. ——, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999). "The element of time can admittedly affect the validity of a search warrant." *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *see also* Fed.R.Crim.P. 41(c)(1). "A search warrant must be executed and returned to the judge or commissioner who issues it within [the time frame specified in the warrant]; after the expiration of this time the warrant, unless executed, is void." *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct.

138, 140, 77 L.Ed. 260 (1932). "If the police were allowed to execute [a] warrant at leisure, the safeguard of judicial control over the search which the Fourth Amendment is intended to accomplish would be eviscerated. Thus, a search pursuant to a stale warrant is invalid." *Bedford*, 519 F.2d at 655.

The Government secured the search warrant for Defendant's premises on February 4, 1999. On February 9, 1999, the Government executed the search warrant and seized two computers from Defendant's home: a Computer Solutions computer, and a Leading Edge computer. In the search warrant issued for Defendant's home, the magistrate judge indicated that the Government had thirty days to review any computer equipment seized from Defendant's home. On March 9, 1999, however, the Government applied for, and was granted, a thirty day extension to the original thirty-day processing period authorized in the search warrant.

█ Yet, even though the Government had sixty days in which to search Defendant's computers, it failed to begin its investigation of Defendant's Leading Edge computer within the time period prescribed. Specifically, following the magistrate judge's approval of the time period extension, the Government had until April 8, 1999, to review Defendant's computers. The Government, however, commenced the investigation of Defendant's Leading Edge computer on April 10, 1999. The Government has offered no legitimate reason for its delay. Therefore, because the Government failed to adhere to the requirements of the search warrant and subsequent order, any evidence gathered from the Leading Edge computer is suppressed.[5]

---

**5.** The Court notes that with respect to the suppression of the Leading Edge computer, many of the facts set forth by the Court in this portion of its Memorandum of Decision and Order are derived from the parties' briefs. The parties have not supplied the Court with all the relevant evidence as to this particular issue; nonetheless, the facts set forth in the Court's discussion are not disputed by the Government.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendant's Motion to Suppress Statements, be, and it is hereby, **DENIED**. Furthermore, it is hereby **ORDERED** that Defendant's Motion to Suppress Search Warrant Evidence be, and it is hereby, **DENIED** as to the evidence obtained pursuant to the execution of the search warrant, with the exception that Defendant's Motion to Suppress Search Warrant Evidence be, and it is hereby, **GRANTED** as to the Defendant's Leading Edge computer.