**UNITED STATES of America**

v.

**Kurt KRUGER, Defendant.**

**No. CR. 00–88–P–C.**

United States District Court,
D. Maine.

June 26, 2001.

---

Jonathan A. Toff, Office of U.S. Atty., Portland, ME, for U.S.

Peter E. Rodway, Rodway & Horodyski, Portland, ME, for Kurt A Kruger, defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

In this case, Defendant Kurt Kruger faces charges of unlawful possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; unlawful engagement in a con-

spiracy to possess and distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); concealment of the illicit use of controlled substances in connection with the acquisition of five firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(B); knowing and unlawful transportation in interstate commerce of firearms as a user of a controlled substance, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2); and unlawful carrying of the firearms in relation to the alleged drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1). *See* Indictment (Docket No. 1). Now before the Court is Kruger's motion to suppress evidence that the Government obtained during a search of his apartment on the night of March 16, 2000. *See* Motion to Suppress Evidence (Docket No. 4); Memorandum in Support of Motion to Suppress Evidence (Docket No. 15). Specifically, Kruger moves to suppress the following items of evidence: a statement that he made identifying the location of cocaine in his apartment; the cocaine that the police officers discovered in the pocket of a jacket inside a closet in his apartment; a detailed statement regarding his involvement in the alleged crimes, made after the police officers' discovery of the cocaine; and all other evidence discovered in his apartment during the search.[1] For the reasons that follow, the Court will grant Kruger's motion with respect to the statement identifying the location of the cocaine and the cocaine found in the jacket pocket, and it will deny his motion with respect to his second statement and the other evidence discovered in his apartment during the search.

## FACTS

Due to unexplained contradictions in the testimony of the seven officers who testified during the suppression hearing[2] and the inability of some of the key witnesses to remember crucial details, the Court is unable to ascertain exactly how the events unfolded on the night of March 16, 2000.[3] The Court will, therefore, set forth the relevant facts as it understands them from the record and, where relevant, highlight factual questions that remain unresolved after the suppression hearing.

The events leading up to the discovery of the challenged items of evidence began when Joseph Robitaille, Special Agent for the United States Bureau of Alcohol, Tobacco, and Firearms (hereinafter "ATF"),

---

1. Defendant does not detail the contents of this other evidence in his briefs and the parties did not offer a police inventory in evidence at the suppression hearing. From the testimony at the hearing, the Court understands this evidence to include the following items that the police discovered in their search of the apartment: a marijuana roach located on the living room floor, marijuana residue and paraphernalia located on the living room coffee table and in one of the bedrooms, and cocaine residue located in a box under the bed in one of the bedrooms. *See* Transcript Volume I (hereinafter "T1") at 29, 32–33, 36, 185, 207–08, Transcript Volume II (hereinafter "T2") at 13.

2. The following Officers testified at the hearing: Joseph Robitaille, Special Agent for the United States Bureau of Alcohol, Tobacco,

and Firearms; Shawn Lally, Detective for the City of Westbrook Police Department; Phillip Hebert, Police Officer for the City of Westbrook Police Department; Thomas Roche, Police Officer for the City of Westbrook Police Department; Kenneth Viger, Agent for the Maine Drug Enforcement Association and Detective for the City of Westbrook Police Department; Stephen Lyons, Detective Sergeant for the City of Westbrook Police Department; and Allen Wright, Probation and Parole Officer for the State of Maine Department of Corrections.

3. The Court notes that it is troubled by the many contradictions and omissions in the factual record. Some of the unresolved factual questions and contradictions are relevant to the Court's legal analysis, while others reflect on the credibility of the officers' testimony.

received a call on the afternoon of March 16, 2000, from an employee at the Kittery Trading Post. This employee reported to Robitaille that an individual named Kurt Kruger had purchased five firearms from the Kittery Trading Post the night before. Reported details about the type and low quality of the firearms raised Robitaille's suspicion about the purchase. He obtained the address that Kruger had provided to the Kittery Trading Post, 47 North Street, Westbrook, Maine, and he subsequently called the City of Westbrook Police Department.

Robitaille spoke with Detective Sergeant Lyons at the Westbrook Police Department, and Lyons indicated that he considered 47 North Street to be in a high crime area and subject to a great deal of drug activity. Lyons told Robitaille that he would have Kenneth Viger, a detective assigned to work with the Maine Drug Enforcement Association (hereinafter "MDEA"), contact Robitaille to assist in the investigation of the matter. Robitaille then conducted a criminal background check on Kruger, and learned that Kruger's criminal record consisted of a series of traffic violations and an arrest in connection with a domestic dispute. Robitaille also spoke with Viger on the telephone and learned that Viger was occupied with other matters that day. Robitaille continued to collect background data and, later that day, contacted Lyons for further assistance.

At approximately 3:00 that afternoon, Robitaille met with Lyons at the Westbrook police station. The two plainclothed officers then decided to check out 47 North Street, the address that Kruger had reported to the Kittery Trading Post. The officers drove to 47 North Street in Robitaille's unmarked car, rang the doorbell, and spoke with an individual named Brenton Blais, who stated that he did not live at the apartment but sometimes stayed there. Blais told the officers that Kruger did live at the apartment, but that he was not there at the moment because he was at work. The officers told Blais that they would be returning to the Westbrook Police Department, and they asked Blais to tell Kruger that he should call them when he returned to the apartment.

Robitaille and Lyons went back to the Westbrook police station and waited there for Kruger's call. After waiting for a short while, they decided to return to the apartment. They arrived at the apartment for the second time sometime around 4:00 p.m. Kruger was still not at the apartment, but Blais and another individual, Adam Lane, were. This time, the officers spoke with Blais and Lane. During this conversation, the officers learned that Blais was on probation, under the supervision of Allen Wright, Probation and Parole Officer for the State of Maine Department of Corrections. The officers told Blais and Lane that they wanted to talk to Kruger about some stolen property and that he should contact them at the Westbrook police station. Although the officers were truly interested in conversing with Kruger about the previous night's firearms sale, they had decided to make up the story about stolen property because they were concerned that if Kruger knew the real reason for their visit, he might destroy or dispose of the firearms. The officers then returned to the Westbrook police station and waited for Kruger's call. At approximately 5:00 that evening, the officers received a call from Kruger. Kruger agreed to meet with the officers at the station, and arrived there some time between 5:00 and 5:20 p.m. The two officers interviewed Kruger in Lyons's office. The officers began the interview with a general conversation about stolen property in the Westbrook area. Kruger volunteered that he had purchased some stereo equipment

from an individual named David LeClair that may have been stolen. At some point during this interview, the conversation shifted to the topic of Kruger's firearms purchase. Kruger stated that he collected cheap firearms, and that he had purchased five firearms from the Kittery Trading Post the night before. Kruger told the officers that, upon testing the firearms after the purchase, he had discovered that three of the firearms did not work. Kruger stated that he intended to return those firearms to the Kittery Trading Post that night, and that they were, therefore, in the trunk of his car in the parking lot. Kruger reported that the other two firearms had been stolen, and he willingly filled out, at the officers' suggestion, a stolen property report for those firearms. After some hesitation, Kruger also told the officers that Blais had been involved in the purchase of the firearms.

At some point during the interview, the officers informed Kruger that they would like to conduct a consent search of his apartment in order to determine whether the pieces of stereo equipment that he had purchased from LeClair were, in fact, stolen. Kruger stated that he did not mind if the officers searched his apartment for stolen property, and he signed a "Westbrook Police Consent to Search" form. *See* Gov't Ex. 1. The form that Kruger signed states:

> I have been requested to consent to a search of the above listed items or area which are located at the above mentioned location. I have also been advised of my constitutional rights to refuse such consent and to require that a search warrant be obtained prior to any

search. I have been further advised that if I do consent to a search, any evidence found as a result of such search, can be seized and used against me in any court of law and that I may withdraw my consent to search at any time prior to the conclusion of the search.

> After having been advised of my constitutional rights as stated above, I hereby voluntarily waive those rights and consent to a search. I authorize the above listed law enforcement officer and anyone else he/she deems necessary to conduct a complete search of the above described item or area.

Gov't Ex. 1. The form contains a space for filling in the address of the search location; it is filled in with the address "47 North Street, Apt. # 1, Westbrook Maine." The form also contains spaces for filling in the "Item or Area to be Searched (Owner to Initial Last Item or Area)" and "Location of Item or Area to be Searched"; these spaces are both filled in with the words "Entire Apartment." Either Kruger read and indicated that he understood the form, or one of the officers read the form to him. Kruger did not make any written modifications to the form. At the time that Kruger signed the form, Lyons had represented to him that if Kruger refused to give his consent to the search, the officers would have to seek a warrant to search the premises. *See* T1 at 63–64, 85–86, 202; T2 at 62.[4]

Before leaving for 47 North Street to conduct the search, the officers took a few preparatory and precautionary measures. The officers contacted Wright, Blais's pro-

---

**4.** As will be discussed, *infra,* a contradiction exists between Lyons's testimony and Robitaille's testimony regarding the exact language that Lyons used in explaining the warrant alternative to Kruger. *Compare* Robitaille's testimony, T1 at 62–63, 86 (recalling that Lyons stated that he could obtain a warrant to search the apartment if Kruger withheld consent), *with* Lyons's testimony, T1 at 202 (stating that he told Kruger that Kruger could force the officers to obtain a warrant by withholding consent).

bation officer, Thomas Roche, an officer with the Westbrook Police Department, and Viger to accompany them on the search. The officers also conducted a search of Kruger's car in the parking lot, frisked Kruger, and seized Kruger's firearms from the trunk. Finally, the officers told Kruger, who was driving alone in his car, not to attempt to contact anyone during the drive over to his apartment.

Kruger and the officers then left for 47 North Street. Kruger was followed by the officers in two City of Westbrook police cars, one marked and one unmarked. Kruger and the officers arrived at 47 North Street at approximately 7:00 p.m. At this time, Blais and Lane were inside the apartment, a three-bedroom apartment with a kitchen, bathroom, living room, and back hallway storage area attached to the kitchen. Kruger entered the apartment, followed by all five of the officers. Kruger informed his roommates that the officers would be searching the apartment.

Immediately upon entering, the officers observed the smell of marijuana. A visual scan of the living room led Roche to observe a vial on top of the stereo system in the living room. Robitaille testified that, shortly after his entry into the living room, he observed a marijuana roach on the floor. The officers told Blais and Lane to sit on the couch in the living room. The officers then presented them with the consent-to-search form that Kruger had signed and requested that they also sign it. The officers stated that, given the smell of

marijuana in the apartment, the officers could get a warrant to search the apartment if Blais and Lane did not sign the consent form. At this point, Kruger came into the living room. Lyons told him to sit on the couch as well.[5] The officers began to search the apartment, and the three occupants of the apartment remained on the couch during the initial phase of the search, under the supervision of Roche.

In the initial phase of the search, the officers found drug paraphernalia and marijuana residue in the living room and in Lane's bedroom, and also found a small bag containing cocaine residue in Lane's bedroom. In Kruger's bedroom, the officers found marijuana residue and paraphernalia. The officers placed these items on a coffee table in the living room. Upon the officers' discovery of these items, Lyons called a halt to the search and called for Officer Phillip Hebert to come to the apartment with his drug-sniffing dog, Zena. Detective Shawn Lally was also called to photograph the scene.

Throughout the evening, the police presence in the apartment was significant. In addition to the five officers who had arrived with Kruger, officers Lally and Hebert arrived at the apartment sometime between 8:00 and 8:30 pm.[6] The occupants of the apartment were allowed to smoke without restriction during the search of the apartment, using an ashtray on the living room table. Other than allowing the occupants the freedom to smoke, the officers exerted a high degree of control over

---

5. The strength of the language that the officers used in getting all three of the residents on the couch remains unclear. *See* Lane's testimony, T2 at 109 ("They told us to sit down and stay still."); Lyons's testimony, T1 at 206 ("I mentioned that I would like you to sit down here."); Roche's testimony, T1 at 179 (stating that he told Kruger to join Blais and Lane on the couch and told all three occupants to remain seated on the couch).

6. The testimony is inexact on this point, but it appears that Hebert was dispatched to the apartment at approximately 8:00 p.m. and that Lally arrived at the apartment around 8:30 p.m. *See* T1 at 142–43, T2 at 96. Zena remained in the car until Hebert used her to conduct a drug-detecting sweep of the apartment.

their activity. The occupants were allowed to leave the couch only when the officers asked for their assistance in one of the other rooms of the apartment or when one of the occupants needed to use the bathroom. Their use of the bathroom was supervised by one of the officers. At one point, Roche left the living room to smoke a cigarette and another officer assumed his responsibility of supervising the occupants.

In addition to the restrictions on their physical movement, the officers placed restrictions on the occupants' ability to interact with the outside world. Although the testimony varied widely at the suppression hearing, it is clear that the occupants' use of the telephone was restricted at least to some degree.[7] The officers answered a significant number of the incoming telephone calls to the apartment, even though the telephone was located on the living room table near the couch on which the occupants were seated. It is unclear whether any of the occupants were allowed to answer or speak on the telephone,[8] although it is clear that the officers prevented the occupants from speaking with some callers.[9] At some point during the search, a young woman arrived at the apartment door to deliver an order of chicken wings.[10] One of the officers, instead of one of the occupants of the apartment, answered the door for the delivery. When one of the roommates stated that he no longer wanted the chicken wings, Lyons stated that he had to pay, explaining that not paying would constitute "theft of services."[11] Lyons received money from one of the occupants and paid for the wings.

After finding the initial drug residue and paraphernalia and stopping the search, the officers separated the three occupants.[12] Blais was moved to the back porch. Krug-

---

7. The testimony regarding the number of times that the phone rang throughout the search ranged from recollections of three to twenty times. *Compare* Robitaille's testimony, T1 at 45 (recalling that phone rang at least twenty times), *with* Roche's testimony, T1 at 164, 179 (remembering three phone calls).

8. *Compare* Wright's testimony, T2 at 94 (Kruger's attorney: "And the men who were in the living room were not allowed to answer [the telephone], is that fair to say?" Answer: "Yes."); and Lane's testimony, T2 at 114, 120 (stating that Kruger was not allowed to speak with his mother when she called the apartment and that Lane was not permitted to answer the telephone or to speak with callers), *with* Robitaille's testimony, T1 at 45–46 (combination of roommates and officers answering the telephone); Roche's testimony, T1 at 164 (stating that one of occupants answered a telephone call at least once and that there were "no restrictions" on occupants' use of telephone); Lally's testimony, T2 at 99–100 (testifying that Lane did speak on the telephone).

9. *See, e.g.,* Robitaille's testimony, T1 at 45–46 (stating that he answered the telephone at least once and told caller that Kruger would have to return the call because he was busy at the moment); Melissa Davidson's Stipulated Testimony, Def.Ex. 4, (stating that a person with a voice she did not recognize answered four of her telephone calls to apartment that night, and that the person told her that Blais was busy and that she should call back later).

10. The chicken wings had apparently been ordered by one of the occupants prior to the officers' arrival at the apartment.

11. Contradictory testimony exists on whether Lyons made this comment in a matter-of-fact or a joking manner. The chicken wings remained uneaten on the kitchen table until Lyons, pursuant to an occupant's offer, ate some of the wings.

12. Again, the Court heard conflicting testimony regarding the forcefulness of the language the officers used in separating the occupants. *See* Lane's testimony, T2 at 111 ("They just said, 'Adam, get up, sit over here. Breton, [sic] come in the kitchen. You have to stay over here. Stay put.' "); Lyons's testimony, T1 at 211 ("I asked one of them to sit in the kitchen or something ... I asked [Blais] to step outside.").

er was moved to the kitchen table. Lane remained on the couch. Hebert arrived either during the separation of the occupants or shortly after the occupants had been separated. The officers informed Hebert about their discovery of the drug residue and paraphernalia, and Hebert told them that they should complete their search of the apartment and that he would do a sweep of the apartment with Zena after they had completed their search and removed all of the drugs they had found. Hebert then accompanied Wright and Lyons to the back porch, where Blais was waiting. The officers read Blais *Miranda* warnings, and he agreed to talk to them. They questioned him about the previous night's trip to the Kittery Trading Post. Blais told the officers that after he and Kruger purchased the firearms, they traveled down to a house in New Bedford, Massachusetts, where Kruger exchanged the firearms for cocaine. Blais also stated that after they returned to Westbrook, he purchased one or two eight-balls of cocaine from Kruger. The officers' questioning of Blais took place approximately fifteen to twenty minutes after Hebert's arrival, and it lasted for approximately fifteen minutes to a half-hour.

Lyons then left Blais on the porch with Hebert and Wright, went into the kitchen, and confronted Kruger with Blais's statement that Kruger had traded the missing firearms for cocaine. Other officers were present in the kitchen, although Lyons could not remember which officers were present at this time. From the various officers' testimony and involvement, it appears that at least Robitaille and Lally were also in the kitchen when Lyons went into the kitchen. *See* Lally's testimony, T1 at 123 ("I was right in the kitchen right in front of the table."); Robitaille's testimony, T1 at 37–38 (placing himself in the kitchen at that time). Without administering *Miranda* warnings, Lyons asked Krug-

er where the cocaine was located. When Kruger hesitated, Officer Lyons again stated that he wanted Kruger to tell him where the cocaine was located. Kruger pointed to a closet in the back storage area and told Lyons that the cocaine was in a jacket in the closet. Either Viger and Robitaille or Viger and Lally then went to the closet and discovered the cocaine in a jacket pocket. *Compare* Robitaille's testimony, T1 at 39 *with* Lally's testimony, T2 at 114.

Lyons then went back on the porch and instructed Wright and Hebert to take a written statement from Blais. Hebert and Wright took Blais inside the apartment, into the kitchen. Blais then sat down at the kitchen table and wrote a statement reflecting what he had said on the porch.

While Lyons was still on the porch, Robitaille took Kruger into the bedroom adjacent to the kitchen by Robitaille. Shortly thereafter, Lyons joined them in the bedroom and read Kruger *Miranda* warnings. Kruger stated that he understood his rights and that he was willing to talk. Kruger told the officers that he had been selling firearms for cocaine in Massachusetts, and that this sale was a part of an ongoing activity in which he had been involved. This interrogation took approximately fifteen to twenty minutes. At the time that Kruger was read his *Miranda* rights, Kruger appeared calm but a little depressed. At some point during interrogation, Kruger expressed that he thought that he was facing a possible jail sentence of 10 years. *See* T1 at 76–78. Robitaille told him that if he cooperated, things could "go easier" for him. Lyons also attempted to get some form of cooperation from Kruger, although he could not remember at the suppression hearing exactly what kind of cooperation he sought. *See* T2 at 77–78. Lyons, however, did not make any

promises of leniency to Kruger. *See id.*[13] Although Robitaille held on to Kruger's wallet throughout the interrogation in the bedroom, the officers did not take out their guns and did not raise their voices.

At some point after he had taken a written statement from Blais, Hebert did a sweep of the apartment with Zena. Hebert could not recall the exact procedure he used while conducting the sweep that night. Hebert testified that, while his general practice is to take Zena around the perimeter of an area two times and then back once more, letting her sniff the areas in between, he knows that he did a less detailed search of the apartment because of its relatively large size and because narcotics had already been discovered. Hebert testified that the back storage area was the last room that he and Zena searched, and that this room was very cluttered, making it difficult for Hebert to take Zena through the area. Zena did not alert to any drugs during this sweep of the apartment.

While Hebert testified that he was later told that the cocaine in Kruger's coat pocket had already been discovered by the time he did the search with Zena, he was not given this information either before or during his search, and no officer told him to pay particular attention to the back room. Every other officer testified that they either did not know or could not remember whether Hebert took the dog through the apartment before or after the discovery of the cocaine.

The lack of testimony on this point is troubling to the Court but, nevertheless, the Court finds that Zena was taken through the apartment after the discovery of the cocaine. The Court found Hebert to be a credible witness and is satisfied as to

the veracity and reliability of the sequence of events that he detailed in his testimony: his arrival at the apartment, his participation in the questioning of Blais on the porch, Lyons's departure from the porch, Lyons's return to the porch and instruction that Hebert and Wright obtain a written statement from Blais, their bringing of Blais into the apartment and seating of him at the empty kitchen table, and, finally, Hebert's search of the apartment with Zena approximately a half-hour to forty-five minutes after the interview with Blais. This sequence, combined with Lyons's testimony concerning the timing of his confrontation of Kruger in relation to the interrogation of Blais and the testimony of both Lyons and Robitaille regarding when Kruger was moved from the kitchen table into the bedroom, convinces the Court that the cocaine was discovered while Lyons was inside the apartment, before Wright and Hebert took Blais's statement, and that Hebert searched the apartment with Zena sometime after the statement had been taken.

Kruger was placed in handcuffs at approximately 8:30 p.m. that evening. *See* T1 at 168, 175–76; Def.Ex. 2. Officer Roche transported him to the Cumberland County Jail. Kruger was processed at the Cumberland County Jail at 9:51 p.m. *See* Def.Ex. 3.

## DISCUSSION

The items of evidence elicited as a result of the activities that took place on the night of March 16, 2000, and that Kruger now seeks to suppress, fall into four categories: the drug paraphernalia that the officers initially found in their search of Kruger's apartment; Kruger's statement

---

13. Neither Robitaille nor Lyons could remember whether Kruger's comments about a possible ten-year jail sentence or their attempts

to elicit cooperation from him occurred before or after the administration of *Miranda* warnings.

identifying the location of the cocaine; the cocaine found in the jacket pocket inside the closet at Kruger's apartment; and the statements that Kruger made after the discovery of the cocaine. Kruger moves to suppress all four categories of evidence, and he invokes various Fourth, Fifth, and Fourteenth Amendment arguments in support of his motion to suppress this evidence. The Government opposes suppression of any of the evidence discovered on March 16, 2000. The Court will consider the arguments as they pertain to each category of evidence.

## A. The Drug Paraphernalia and Marijuana and Cocaine Residue Found in the Apartment

■ Kruger moves to suppress the drug paraphernalia initially found in the apartment as a violation of his Fourth Amendment rights, arguing that this evidence constitutes the fruit of an unlawful search because his consent to the officers' search of his apartment was not voluntary. The Government responds that consideration of the totality of the circumstances reveals that Kruger did voluntarily consent to the search of his apartment. Alternatively, the Government contends that Blais and Lane had authority to, and did, authorize the search of the apartment and that Kruger does not have standing to challenge their consent.

The Fourth Amendment protects individuals against "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. *See also* U.S. CONST. amend. XIV. The courts

have long recognized an exception to the Fourth Amendment's warrant and probable cause requirements that allows for a search to be conducted if an individual has consented to the search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). In invoking this consent exception to the warrant/probable cause requirement, the Government has " 'the burden of proving that the consent was, in fact, freely and voluntarily given.'" *Id.* (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)). In ascertaining the voluntariness of the consent to a search, a court must consider the totality of the circumstances, including "age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Barnett,* 989 F.2d 546, 554–55 (1st Cir.1993), *cert. denied,* 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). Other considerations that a court should take into account include "whether the consenting party was advised of his or her constitutional rights and whether permission was obtained by coercive measures or under inherently coercive circumstances." *Id.*

■ In this case, a number of factors weigh in favor of the Court making the determination that Kruger's consent to the search of his apartment was voluntary. Most significantly, Kruger signed a form that stated that he voluntarily consented to the search, understood his constitutional rights, and was aware of the potential consequences of the discovery of any evidence found in his apartment during the search. *See* Gov't Ex. 1. Kruger's age, professional employment,[14] and education indicate that he was able to understand the contents of this form and the officers' explanation of

---

**14.** The officers testified that, in interviewing Kruger, they learned that he worked at Unum

Provident Corporation.

his rights.[15] These factors also negate any assertion that Kruger was particularly vulnerable in his interaction with the officers. Additionally, the officers testified that Kruger's demeanor was cooperative and calm. Although the consent was obtained at the police station rather than in familiar surroundings, the Court is satisfied that the atmosphere in Lyons's office was cooperative rather than coercive. In addition, the officers were not required to administer *Miranda* warnings prior to obtaining his consent to search, given Kruger's voluntary presence at the station, the cooperative nature of the interaction between Kruger and the officers, and Kruger's apparent freedom to leave the police station.

Two aspects of the officers' conduct in obtaining Kruger's consent call into question the voluntariness of the consent. First, it appears that the officers engaged in some trickery in obtaining this consent by stating to Kruger, before presenting him with the consent form, that they wanted to search his apartment for stolen property. That was not the true motivation underlying the search of the apartment. Kruger's statement to the officers that he did not mind if they searched his apartment for stolen property indicates that he was misled as to the intended scope of the search. However, given the clear and unambiguous specification of "entire apartment" and "any evidence found" on the consent form that Kruger signed, the officers' oral misrepresentation regarding the purpose of their search did not render Kruger's consent involuntary.

 Second, Kruger contends that Lyons told him that the officers could obtain a warrant if he did not consent. The Supreme Court has held that a claim of lawful authority to search is highly indicative of coercion because it "announces in effect that the occupant has no right to resist the search." *Bumper,* 391 U.S. at 550, 88 S.Ct. at 1792. *See also United States v. Maldonado Garcia,* 655 F.Supp. 1363 (D.P.R.1987) (suppressing evidence found when police gained entry to a suspect's apartment by knocking on the door and announcing that they had a summons to serve when, in fact, they did not have one). Various courts, however, have indicated that, in certain circumstances, a representation that an officer will obtain a warrant does not render consent involuntary. *See, e.g., id.* at 1368 ("Consent may be valid if given in response to an officer's declaration that he may *seek* a warrant."); *United States v. Miller,* 589 F.2d 1117, 1132 n. 13 (1st Cir.1978) (noting that officers' assertion that he would obtain a warrant if the defendant would not consent did not make the consent involuntary); *United States v. Salvo,* 133 F.3d 943, 954 (6th Cir.1998) ("It is well-settled that the agent's statements to the effect that he would obtain a warrant if Salvo did not consent to the search does not taint Salvo's consent to a search."); *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992) (explaining that "when the expressed intention to obtain a warrant is genuine . . .

15. In his reply brief, Kruger's attorney proffers that Kruger has a lower educational level than the Government represented to the Court. Specifically, Kruger's attorney represents to the Court that Kruger dropped out of high school and that, although he later enrolled in a program at the music department of the University of Southern Maine that would allow him to transfer credits toward his high school diploma, he was enrolled in this program for less than three semesters and never transferred those credits toward his high school diploma. *See* Defendant's Reply to Government's Memorandum of Law Regarding Motion to Suppress (Doc. No. 19) at 2. If it were to be considered by the Court, which it is not because it is not in evidence, the representation that Kruger completed at least some college-level courses would weigh in favor of, rather than against, Kruger's ability to read and understand the form and to voluntarily give his consent.

and not merely a pretext to induce submission, it does not vitiate consent"). The Court need not decide whether this case involves such a circumstance. Kruger's argument relies on Robitaille's testimony regarding statements made by Lyons. Robitaille testified that he overheard Lyons state to Kruger that the officers could obtain a warrant to search the apartment. *See* T1 at 62–63, 86. However, this statement conflicts with Lyons's own testimony. Lyons testified that he did not believe that he had told Kruger that he would get a warrant if Kruger did not consent to the search; rather, in explaining Kruger's rights, he stated that Kruger had a right to refuse consent and to make the officers obtain a warrant to search the apartment. *See* T1 at 202.

The Court finds Lyons credible on this point. Lyons did not appear to be attempting to conceal anything from the Court in his explanation of how he obtained the consent to search. In contrast, Lyons specifically testified that he recalled stating to Blais and Lane that if *they* refused to consent, he could get a search warrant because of the smell of marijuana. *See* T2 at 65. Although Robitaille stated that he was certain as to what Lyons said

to Kruger, the record does not reveal Robitaille's proximity to Lyons when he overheard this statement.[16] Moreover, Robitaille's testimony conflicts with a number of the officers on several points,[17] and the Court also questions his veracity in asserting his ability to precisely recall certain details such as this one while also testifying that he had completely forgotten other significant aspects of the evening.[18]

In light of all of the other factors pointing to the voluntariness of Kruger's consent and the noncoercive nature of the interaction between Kruger and the officers up to and during his signing of the consent form, Lyons's explanation to Kruger alone does not render Kruger's consent involuntary. The Court concludes that the evidence obtained was the fruit of a search to which Kruger voluntarily consented, rather than the fruit of an unlawful search. Given this finding, the Court need not address the Government's alternative argument regarding the consent of Lane and Blais.

## B. Kruger's Statement Identifying the Location of the Cocaine

■ Kruger has moved to suppress the statement he made to the officers identify-

---

**16.** Robitaille testified that he was not present during the entire conversation pertaining to the consent search.

**17.** *Compare, e.g.,* Robitaille's testimony, T1 at 39 (stating that Robitaille accompanied Viger on the search of the closet), *with* Lally's testimony, T1 at 114 (stating that Lally accompanied Viger on the search of the closet); Robitaille's testimony, T1 at 51 (stating that Viger did not join the officers until they had already arrived at the apartment), *with* Viger's testimony, T1 at 184, and Lyons's testimony, T2 at 60–61 (stating that Viger joined other officers at Westbrook police station before they left for apartment); Robitaille's testimony, T1 at 52–53 (stating that Kruger was arrested at approximately 10:30 or 11:00), *with* Roche's testimony, T2 at 176, and Westbrook Police Arrest Report, Def.Ex. 2 (arrest of Kruger took

place at 8:30); Robitaille's testimony, T1 at 45 (phone rang twenty times), *with* Lally's testimony (phone rang at least two times) and Roche's testimony (recalling that phone rang three times); Robitaille's testimony, T1 at 12–13 (indicating that Lyons made the representation to Blais), *with* Lyons's testimony, T1 at 193 (Robitaille did most of the talking with Blais regarding the officers' purpose for finding Kruger). *See also* Robitaille's testimony, T1 at 50 (stating that officers left for apartment some time between 7:00 and 8:00 p.m., but later stating that officers arrived at apartment some time between 7:00 and 7:30 p.m.).

**18.** For example, Robitaille testified that he did not recall whether Hebert brought Zena through the apartment before or after the discovery of the cocaine. *See* T1 at 43.

ing the location of the cocaine on three grounds. First, Kruger argues that this statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, Kruger maintains that this statement was involuntarily obtained, in violation of his due process rights under the Fourteenth Amendment. Third, Kruger regards this statement as the fruit of an illegal arrest, in violation of his Fourth Amendment rights. The Government disputes all of these contentions, maintaining that Kruger was not in custody, that his statement was not coerced, and that the cocaine would have inevitably been discovered in the absence of any constitutional violations that the Court may find.

The Court first turns to the Miranda issue. *Miranda* warnings are required when a suspect is in custody and is interrogated. *See id.* There is no dispute that Kruger was not read *Miranda* warnings prior to Lyons's posing the question that elicited the location of the cocaine, and the Government does not argue that Lyons's confrontation did not constitute interrogation within the meaning of *Miranda.* The Court finds that Lyons interrogated Kruger by asking him where the cocaine was located. At issue in this case is whether Kruger was in custody at the time that Lyons confronted him with the information the officers had learned from Blais and demanded to know the location of the cocaine. An interview is custodial if a reasonable person in the defendant's position at the time of questioning would believe that he was "deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. The determinative issue in the custody inquiry is "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 324, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293

(1994) (quotations omitted). In making this determination, a court considers such factors as "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Lanni,* 951 F.2d 440, 442 (1st Cir.1991) (citations omitted). "As a general rule, courts are unlikely to find that an interview which takes place in a defendant's home is 'custodial' because the familiarity of the surroundings tends to dispel the 'police-dominated' atmosphere which characterizes custodial situations." *United States v. Barlow,* 839 F.Supp. 63, 66 (D.Me.1993). *See, e.g., United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994). "Nevertheless, detention of a person at home during the execution of a search ... may amount to custody for purposes of *Miranda.*" *Barlow,* 839 F.Supp. at 66. *See also United States v. Bunnell,* 106 F.Supp.2d 60, 67 (D.Me.2000).

The Court finds that by the time that Lyons demanded that Kruger inform him of the location of the cocaine, Kruger was in custody within the meaning of *Miranda.* By the time that Lyons insisted Kruger disclose the whereabouts of the cocaine, Kruger had been with officers Lyons and Robitaille for more than three hours, five officers had been in his home for over one and one-half hours, and two more officers and a dog had recently arrived. The officers had frisked Kruger, searched his car, and taken his firearms. The officers had taken active steps to restrict, control, and monitor Kruger's movement around the apartment, and they had taken significant measures to isolate him from his roommates and the outside world as well as to control the occupants' movements about the apartment. The officers had clearly

taken coercive control of events occurring in the apartment. The degree of control exerted by the officers had increased in intensity throughout the evening, and the intensity of their asserted control was rapidly escalating as Lyons impatiently repeated his demand that Kruger reveal the location of the cocaine in the presence of two other officers. *See Lanni,* 951 F.2d at 443. At this point, nothing about Kruger's environment would have indicated to a reasonable person that the police presence would abate in the near future or that Kruger was free to leave the apartment. Lyons, himself, described the scene as an "ordeal." *See* T2 at 8. Although Lyons also testified that he would have let Kruger go up until the point of the discovery of the cocaine,[19] the Court does not believe that to be the case. Moreover, neither Lyons nor any of the other officers ever told Kruger that he was not under arrest or that he was free to leave. *See Lanni,* 951 F.2d at 442, *Bunnell,* 106 F.Supp.2d at 68; *United States v. Brunette,* 76 F.Supp.2d 30, 33–34 (D.Me.1999). *See also Stansbury v. California,* 511 U.S. at 324, 114 S.Ct. at 1529–30 ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*"); *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)

("A policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time.").

The Court acknowledges that some factors weigh against a finding that Kruger was in custody and that, in some respects, this case may fall into a "gray area." *Lanni,* 951 F.2d at 443. First, the officers' initial entry into the apartment took place at a reasonable time of the evening. Nevertheless, by the time that Lyons confronted Kruger, the circumstances suggested that the presence of the officers would continue into unreasonably late hours of the night. It is also true that Kruger had voluntarily consented to the officers' entry into and search of his apartment. However, this factor is tainted by the officers' use of trickery to obtain the consent. *See Lanni,* 951 F.2d at 441 (identifying lack of trickery or use of false information as a factor mitigating against finding of custody). Third, Kruger and his roommates were allowed to eat and smoke, and they may have been permitted to speak on the telephone to a limited degree. However, these factors alone, in light of the totality of the circumstances surrounding Lyons's confrontation of Kruger, would not lead a reasonable person in Kruger's position to believe that he or she could leave the apartment freely.[20]

---

**19.** *See* Lyons's testimony, T1 at 219–20, T2 at 2–4 (stating that until the point that the cocaine was found, he did not believe that he had probable cause to arrest Kruger).

**20.** The Court also notes that it views this case as distinct from *United States v. Quinn,* 815 F.2d 153 (1st Cir.1987), and *Ritchie,* 35 F.3d at 1485–1486. In *Quinn,* the court's conclusion that those defendants were not in custody was based on its reasoning that the detention constituted a continuation of a lawful *Terry* stop in a "swiftly developing situation." *Quinn,* 815 F.2d at 156. The Government has not attempted to analogize the search of De-

fendant's home to a lawful *Terry* stop. Moreover, the Court makes several distinctions between the circumstances in this case and those in *Quinn,* including the educational levels of the defendants, the duration of time between the initial police contact and the interrogation, and the fact that one of the defendants in *Quinn* had asked the officers to stop the search of his vehicle and the police had complied. The officers' measures to isolate Kruger from his roommates and the outside world, as well as the restraints on the occupants' movements around the apartment exceed such measures taken in either *Quinn*

In summary, consideration of the factors underlying the *Miranda* custodial inquiry leads the Court to conclude that Kruger was in custody at the time that Lyons questioned him about the location of the cocaine. Because neither Lyons nor any of the other officers had read Kruger *Miranda* warnings prior to this interrogation, Kruger's statements identifying the location of the cocaine must be suppressed. Given this conclusion, the Court will not address Kruger's Fourteenth and Fourth Amendment arguments in favor of suppression.

### C. The Cocaine

█ Advancing essentially the same arguments that he set forth for the suppression of his statements identifying the location of the cocaine, Kruger contends that the cocaine itself must be suppressed because its discovery constitutes the fruit of a *Miranda* violation, an involuntary statement, and/or an unlawful arrest. The Government responds by maintaining that no constitutional violation occurred and that, even if the Court does find that a constitutional violation led to the discovery of the cocaine, the inevitable discovery doctrine should prevent the Court from suppressing the cocaine.

When evidence obtained in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights leads to the discovery of additional evidence, that additional evidence, often referred to as the "fruit of the poisonous tree," may need to be suppressed in order to protect the defendant's constitutional rights. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (applying fruit of poisonous tree doctrine in Fourth Amendment context); *Nix v. Williams,* 467 U.S. 431, 442, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (noting that fruit of poisonous tree doctrine applies to the Fifth and Sixth Amendments as well as the ·to Fourth Amendment). Suppressing the use of such evidence at trial serves to "deter police from violations of constitutional and statutory protections" by ensuring that "the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." *Nix,* 467 U.S. at 442–43, 104 S.Ct. at 2508. Kruger argues, in the first instance, that the cocaine discovered in his coat pocket constitutes the fruit of the *Miranda* violation and, thus, should be suppressed under the fruit of the poisonous tree doctrine.

The Government does not dispute the applicability of the fruit of the poisonous tree doctrine or the causal connection between the cocaine and Kruger's pre-*Miranda* statements. Instead, the Government contends that the cocaine should not be suppressed under the fruit of the poisonous tree doctrine because the police would have inevitably discovered it even if Kruger had not responded to Lyons's pre-*Miranda* questioning.[21] Although both Kruger and the Government assume that

---

or *Ritchie. See id.; Ritchie.,* 35 F.3d at 1481. The Court does credit the Government's assertion that many of the measures were taken in an effort to protect the safety of the police officers. Nevertheless, the legitimate safety goals of some of these steps does not alter the Court's conclusion that a reasonable person in Kruger's position would not have felt free to leave the kitchen at the time of Lyons's interrogation.

**21.** It does so in spite of the fact that the United States Attorney's Office in this District has only recently put forth a strong argument in another case in this District that "under established Supreme Court precedent the exclusionary rule does not apply to the 'fruits' of a *Miranda* violation." *United States v. Faulkingham,* 2001 WL 586667 at *5 (D.Me. May 29, 2001) (Kravchuk, Magistrate Judge). No reason is given for the Government's failure to take a consistent position in this case.

the fruit of the poisonous tree doctrine applies to evidence that is the fruit of a statement obtained in violation of *Miranda*, that application of the doctrine in that context has been, in the past, thought to be the subject of a distinct, analytical inquiry.

The question of whether the tangible fruits of an interrogation conducted in violation of *Miranda* requirements are subject to exclusion from evidence against the person so interrogated under the Fifth Amendment provision guaranteeing freedom from self-incrimination is clearly generated in this case, even though not noticed or briefed by counsel. That question has been, prior to the Court's decision in *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the subject of much labored judicial analysis. *See, e.g., United States v. Byram*, 145 F.3d 405 (1st Cir.1998); *United States v. Elie*, 111 F.3d 1135, 1141–42 (4th Cir.1997); *United States v. Cherry*, 794 F.2d 201, 207–08 (5th Cir.1986), *cert denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).[22] The decision in *Dickerson* changed the landscape, however, by conferring constitutional status on the *Miranda* right to a warning. Since *Dickerson*, the answer to the question is properly demonstrated by a clear and direct analytic construct based entirely on recognized decisions of the United States Supreme Court:

(1) a person in custody has a right *not* to be interrogated without first being given a four-point warning of his rights in respect to such interrogation and of the consequences of responding to the interrogator's questions, *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612, which right is of constitutional origin and dimension, *Dickerson*, 530 U.S. at 440, 120 S.Ct. at 2334;

(2) tangible evidence obtained directly or indirectly as a result of a violation of the constitutionally based rights of a person cannot be, over objection, introduced into evidence in a criminal case against the person whose rights have been violated in obtaining the evidence, *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963) ("The exclusionary rule has *traditionally* barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.") (emphasis added) *Nix*, 467 U.S. at 442, 104 S.Ct. at 2508 (purpose of fruit of poisonous tree doctrine is to "deter police from violations of constitutional and statutory protections"); and

(3) therefore, tangible evidence obtained directly or indirectly from an interrogation conducted in violation of the strictures of *Miranda*, a violation of rights of constitutional dimension, must be, on demand, suppressed.

Here, the Court has found that the interrogation of Defendant Kruger in respect to the location of the cocaine in question was conducted in violation of the

---

**22.** The Supreme Court has explicitly refrained from squarely resolving this question. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (stating that reasoning of decision in *Tucker* "applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness nor an article of evidence but the accused's own voluntary testimony"); *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974) ("Although we have been urged to resolve the broad question of whether evidence derived from statements taken in violation of the *Miranda* rules must be excluded regardless of [whether] the interrogation took place [before or after the *Miranda* decision], we instead place our holding on a narrower ground.").

strictures of *Miranda* (*e.g.*, without Kruger having been given *any Miranda* warning whatever). It is clear that this violated his constitutional rights, *Dickerson*, 530 U.S. at 440, 120 S.Ct. at 2334, not to be compelled to incriminate himself under the Fifth Amendment to the United States Constitution. Tangible evidence so obtained cannot be used against him in any criminal case. *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417 (The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made, has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."). The Court finds that the cocaine in this case was found as a direct result of Kruger's answer to the unwarned interrogation question regarding its whereabouts. No independent causal factor of any kind intervened between the answer and the discovery of the cocaine. It may not, therefore, be used against him to convict him of any criminal charge set out in the present Indictment, and it is, therefore, to be suppressed from evidence in such proceedings.

Prior to the decision in *Dickerson*, the issue of suppression of evidence discovered as a result of a violation of *Miranda* turned on a complex and largely opaque analysis attempting to resolve on an *ad hoc* basis the tension between the reliability of the subject evidence and the goal of deterrence of police misconduct. *See, e.g.*, *Byram*, 145 F.3d 405; *United States v. Downing*, 665 F.2d 404 (1st Cir.1981). This Court believes all of that has gone by the board with the conferral by *Dickerson* of constitutional status on the right to a *Miranda* warning.

However, to the extent that the prior learning is found to remain viable after *Dickerson*, the Court finds the deterrence rationale compelling in the instant case.

As in *United States v. Downing*, "the police questioning ... would not reasonably be expected to lead to an admission of guilt; rather, the questions were likely to and did lead to [incriminating] evidence," *Downing*, 665 F.2d at 409. The exclusion of the cocaine, the substance—indeed essence—of the suppressed statements, is necessary to deter law enforcement officers from foregoing the administration of *Miranda* warnings in future cases in which they believe that they may successfully gain access to tangible evidence that will be usable at trial despite the violation of *Miranda* strictures. The Court also believes that, while the factors that controlled in *Byram*, 145 F.3d at 409–10, are not directly implicated in the instant case, they do support application of the fruit of the poisonous tree doctrine to the physical evidence in this case. The *Miranda* violation here was not merely a technical one; there is a "substantial nexus" between this violation and the discovery of the cocaine; and the discovery of the cocaine itself was not preceded by any constitutional safeguard. *Id.*

The issue now becomes one of whether, absent the discovery of the cocaine as a result of the *Miranda* violation, the officers would have inevitably discovered the cocaine. *Nix*, 467 U.S. at 442, 104 S.Ct. at 2508.

### D. Inevitable Discovery of the Cocaine

 The inevitable discovery doctrine provides that evidence that would have inevitably been discovered absent police misconduct may be used at trial. *See Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. The Supreme Court has based this doctrine on the reasoning that the deterrence rationale of the fruit of the poisonous tree doctrine will persist as long as police are not put in a better position than they would have been absent the constitutional violation.

*See id.* Hence, in order for evidence to be used pursuant to the inevitable discovery doctrine, the Government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* The Government may not fulfill this burden by mere "speculative elements," but must instead rely on "demonstrated historical facts capable of ready verification or impeachment."[23] *Id.* at 444 n. 5, 104 S.Ct. at 2509 n. 5. *See also United States v. Ford,* 22 F.3d 374, 379–80 (1st Cir.1994). The Court of Appeals for the First Circuit has explained that three basic concerns animate the independent discovery analysis: "are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken [constitutional] protection"? *United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988). Within this framework, the Court's determination is a flexible, fact-specific one. *See Ford,* 22 F.3d at 377.

A range of examples guide the Court's analysis on the question of inevitable discovery. In *Nix,* 467 U.S. at 448, 104 S.Ct. at 2511, the Court held that the evidence of a victim's body would have inevitably been discovered in an ongoing search. There the Government had offered the Court testimony that 200 volunteers had been in the process of systematically searching the neighboring county for the victim's body when the police had learned of its location through the violation of the defendant's Sixth Amendment rights, that had the body not been found, the same systematic search would have progressed into the county where the body was found, that the body was located near a culvert, a landmark to which the attention of the volunteers had been specifically directed, and that the estimated time for this alternative discovery of the body ranged between three to five hours. *See id.* By contrast, in *Rogers,* 102 F.3d at 646–47, the Court of Appeals for the First Circuit, although affirming a district court's application of the inevitable discovery doctrine on the principle of harmless error, expressed some concern over a district court's finding that a concealed safe would have inevitably been discovered in the absence of a *Miranda* violation, given the defendant's "unanswered claim" that the search was being abandoned when the defendant revealed the safe's location. *See also Ford,* 22 F.3d 374, 378 (1st Cir.1994) (holding, in light of court's finding of probable cause and evidence in record that officers had already made decision to seek

---

**23.** A forceful analytical argument can be made that because the Government's officers, by the *Miranda* violation, destroyed the only physical conditions in which it can be persuasively tested whether the officers or Zena would have found the cocaine if it had remained in place, they have stripped the Government of the ability to make the affirmative demonstration necessary to carry its burden of proof. Once the Government has done illegal acts that *actually* lead to discovery of the cocaine and has taken the cocaine out of its place, the question of whether it would subsequently have been found for other reasons becomes, necessarily, inherently "speculative."

Though attractive, the Court has indulged no "shoot yourself in the foot" corollary to the exclusionary rule. As Judge Bodine has observed, the use of the word "inevitable" in the *Nix* doctrine "is something of an overstatement," and that while the requisite probability of discovery "has not been quantified ... it only confuses matters to pretend that the government must prove to a certainty what would have happened but for the illegally obtained admission." *United States v. Rogers,* 102 F.3d 641, 646 (1st Cir.1996).

a warrant, that physical evidence found during warrantless search would have inevitably been found by officers), *cert. denied*, 513 U.S. 900, 115 S.Ct. 257, 130 L.Ed.2d 177 (1994); *United States v. Infante–Ruiz*, 13 F.3d 498, 503–04 (1st Cir. 1994) (holding that inevitable discovery doctrine did not justify admission of physical evidence found in vehicle because government had not shown that officers had probable cause to take legitimate custody of vehicle and government had not introduced evidence of standardized policy that would have led to search of vehicle).

Kruger's consent to search the apartment, the large number of police officers searching the apartment, and the presence of a drug-sniffing dog constitute the Government's strongest points in support of the inevitable discovery of the cocaine. These historical facts indicate that a search was ongoing, one that might have eventually led to the discovery of the cocaine. However, the Court is not satisfied that the Government has met its burden of proof by a preponderance of the evidence. The deficits in the Government's evidence fall into two main categories. First, the Government did not produce any evidence that the officers would have continued to search the apartment until the cocaine had been discovered; *Cf. United States v. Doe*, 61 F.3d 107, 110 n. 5 (1st Cir.1995) (noting lack of evidence regarding procedures or custom regarding search of package type in which evidence had been discovered). *Infante–Ruiz*, 13 F.3d at 504 (setting forth as one ground for rejection of independent discovery finding the government's failure "to introduce any evidence that their actions were controlled by established procedures and standardized criteria" that would have led to inventory search). While it might have been possible for the Court to draw an inference that, after hearing Blais's testimony, the officers would have continued to search the apart-

ment until they found the cocaine, the Government offered no such testimony on this point. Instead, the Government elicited testimony from Lyons, the officer coordinating the search efforts that night, that he did not credit Blais's implication of Kruger in the drug trade until after the cocaine was found. *See* Lyons T1 at 220 ("I would not have arrested him.... I have one person, a convicted felon who is concerned about his own rear end, quite frankly, and I wanted to corroborate something more."); T2 at 3 ("My feeling with Mr. Kruger was up until that point, he was a victim of a burglary from his motor vehicle.... He had done nothing wrong ... up until that point ... the point until the ... cocaine was found."). Although the Court finds Lyons's testimony of dubious credibility on this point, this testimony is significant in light of the rule that the Government has the burden of establishing inevitable discovery by a preponderance of the evidence. Testimony that the officer coordinating the investigation did not view Kruger as a suspect until after the discovery of the tainted evidence decreases, rather than increases the likelihood of inevitable discovery. Lyons's testimony distinguishes this case from *United States v. Procopio*, 88 F.3d 21, 27 (1st Cir.), *cert. denied*, 519 U.S. 1138, 117 S.Ct. 1008, 136 L.Ed.2d 886 (1997), in which officers testified that the individual who had left a subsequently searched briefcase alongside a road had already been the focus of a federal robbery investigation. Moreover, unlike the evidence in *Nix*, 467 U.S. at 449, 104 S.Ct. at 2511–12, which portrayed a methodical and systematic search, the evidence in this case suggests a chaotic, disorganized search in which the officers were not even clear as to what evidence they were hoping to find. The entire interview and search process was characterized by a random, "hit or miss"

approach. The Court is not persuaded by a preponderance of the evidence that the officers would have inevitably searched the jacket pocket in which the cocaine was found.

Nor has the Government established by a preponderance of the evidence that Zena would have inevitably alerted to the cocaine in Hebert's sweep of the apartment. Given the Court's finding that the cocaine had been removed from the jacket pocket prior to Zena's sweep of the apartment, the question is whether Zena would have alerted to the cocaine if the sweep had occurred prior to its actual discovery.[24] The Government has failed to establish, by a preponderance of the evidence, that the Court can answer this question affirmatively. Hebert testified that he conducted a less thorough sweep than usual, given the size of the area to be searched and his knowledge that some drugs had already been found. Moreover, Hebert indicated that, due to the clutter in the back closet, Zena's search of that closet was even more haphazard than her search of the other rooms in the apartment. Specifically, Hebert stated, "It was very cluttered in that room and I basically took the dog in, hoping that any large amount in there, if there was any, she would sniff it out. It was hard to get through." T2 at 105. Finally, Hebert speculated that Zena "in her state with marijuana and the cocaine being throughout the house, was very excited anyways." Hebert's testimony leads the Court to conclude that Zena would not have alerted to the cocaine if it was still in the jacket pocket at the time of the search.

In summary, the Court finds that the discovery of the cocaine was the fruit of a *Miranda* violation, and the Government has not met its burden of proving that this evidence would have inevitably been discovered.[25] Hence, the cocaine must be suppressed.

### E. Kruger's Statements After the Discovery of the Cocaine

█ The Court turns, finally, to the statements Kruger made after the officers had discovered the cocaine. These statements occurred after Kruger had been moved into the bedroom and the officers had administered *Miranda* warnings to him. Kruger argues that these statements should be suppressed because they were involuntarily made and because they were the fruit of an illegal arrest.

The admission into evidence of an involuntarily made confession is violative of a defendant's Fourteenth Amendment due process lights. *See Haynes v. State of Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). "The question in each case is whether the defendants' will was overborne at the time he confessed." *Id.* (citations omitted). "In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Id.* The Government has the burden of proving by a preponderance of the evidence that a confession was voluntarily made. *See United States v. Pinto,* 671 F.Supp. 41, 57 (D.Me.1987). Kruger's main contention regarding the alleged involuntary nature of the statements at issue is that he shared with the officers his mistaken assumption that he was possibly facing a ten-year jail sentence as a result of the discovery of the cocaine and Blais's statements implicating Kruger in the sale

---

**24.** This is, as previously noted, *supra* n. 22 at 101, a problematical inquiry because of the inevitable impact in the circumstances of this case of the needless *Miranda* violation.

**25.** Given this conclusion, the Court need not address whether the cocaine must be suppressed as the fruit of an involuntary confession or the fruit of an unlawful arrest.

of guns for drugs and that, instead of correcting this mistake, the officers exploited the mistake by telling him that things could go more easily for him if he cooperated. Not only does Kruger fail to cite law to show that his ten-year prediction was inaccurate,[26] but the Supreme Court "has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness." *Elstad,* 470 U.S. at 316, 105 S.Ct. at 1297. While it is true that "direct or implied promises, however slight" may render a confession involuntary, *see Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (quotations omitted), such promises serve as just one factor under a consideration of the totality of the circumstances. *See United States v. Jackson,* 918 F.2d 236, 242 (1st Cir.1990). *See also Byram,* 145 F.3d 405 (holding that "trickery is not automatically coercion" and noting that "in recent years, the Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as involuntary") (citing *Colorado v. Connelly,* 479 U.S. at 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)).

Kruger, however, argues that the officers' representation, in light of the totality of the circumstances, makes his subsequent statements involuntary. In support of this contention, Kruger points to the deception used by the officers in obtaining his consent to search the apartment, his isolation in the apartment, the significant presence of law enforcement officers in the apartment, his lack of experience with the criminal justice system, and the officers' confrontation of Kruger with other incriminating evidence. Although the Court finds that these factors do establish that Kruger was in custody, the Court does not find that they render his confession involuntary. Several factors lead the Court to distinguish this case from other cases in which confessions have been suppressed as involuntary. First, the interrogation was relatively short in its duration, in that it lasted only fifteen to twenty minutes. Second, the officers did not threaten Kruger in any way during the course of the interrogation. Third, the record does not indicate that the officers intentionally or blatantly lied to Kruger in order to obtain the confession, or that Kruger had a misunderstanding as to the consequences of a decision to confess or not to confess. *Cf. Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir.1997) (upholding district court's determination that confession was coerced when police lied to defendant about strength of evidence against him and told him that he would get a jail sentence of twenty-five years unless he confessed); *United States v. Rogers,* 906 F.2d 189, 192 (5th Cir.1990) (holding that confession was not voluntary because defendant had not known that he was target of investigation and had been assured that he would not be arrested if he cooperated with officers in purported investigation, and, thus, did not have "a full awareness of the consequences of the decision to abandon his rights or with the requisite level of comprehension"); *United States v. Tingle,* 658 F.2d 1332, 1334 (9th Cir.1981) (suppressing confession that resulted from false suggestion that defendant's boyfriend had implicated her in the crime being investigated and telling defendant that she might not see

**26.** The Court will not speculate on what sentence Kruger may face as a result of the charges filed against him, but does note that, given the drug sentencing provisions of 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 924(c), the officers present at the time, an ATF agent and a city police officer, may have well thought that Kruger could possibly be facing ten years of incarceration, even assuming that he had no other criminal record.

child for a while if she went to prison). Finally, Kruger's demeanor did not indicate that he felt coerced in any way. *Cf. Tingle,* 658 F.2d at 1334 (noting that defendant was sobbing and shaking throughout the interrogation). The Court, therefore, finds that Kruger's post-*Miranda* statements were voluntarily made.

■ Kruger also urges the Court to suppress the statements as the fruit of an unlawful arrest. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The Court will not suppress the statements on this ground. By the time that Kruger made these statements, the officers had probable cause to place him under arrest. Even without the evidence obtained as a result of the *Miranda* violation, the officers had information from Blais and other sources regarding the illegal drug transaction the night before, which was corroborated by the Kittery Trading Post's report of the previous night's purchase of five firearms, Kruger's inability to produce two of those firearms within twenty-four hours of their purchase, and the discovery of cocaine residue in the apartment. The officers also had discovered evidence of other illicit drug use at the apartment, and some of this had been found in Kruger's bedroom. Given the Court's determination that the officers had the requisite level of probable cause to place Kruger under arrest, the statements are not subject to suppression as the fruit of an unlawful arrest.

## CONCLUSION

In conclusion, the Court will deny Defendant's motion to suppress the initial drug paraphernalia and residue found in his apartment and the post-*Miranda* statements, and it will grant Defendant's motion to suppress the pre-*Miranda* statement in response to the inquiry as to the location of the cocaine and the cocaine

found in the jacket pocket as a direct result thereof. The circumstances surrounding the suppressed statements and the resultant discovery of cocaine gave rise to Defendant's constitutional right to *Miranda* warnings, which the officers failed to administer. The Government has failed to provide the Court with credible and reliable evidence establishing that the Government would have obtained the evidence in the absence of this *Miranda* violation.

Therefore, the Court **ORDERS** that Defendant's Motion to Suppress the pre-*Miranda* statement and the cocaine found in Defendant's jacket pocket be, and it is hereby, **GRANTED.** The Court **ORDERS** that in all other respects, Defendants Motion to Suppress be, and it is hereby, **DENIED.**

So **ORDERED.**